UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.   20cr10319 |
| v. | Violations: |
| DANIEL J. GRIFFIN and WILLIAM W. ROBERTSON, | Count One: Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds (18 U.S.C. § 371) |
| Defendants | Count Two: Theft Concerning Programs Receiving Federal Funds; Aiding and Abetting (18 U.S.C. §§ 666(a)(1)(A) and 2) |
| | Counts Three - Ten: Wire Fraud; Aiding and Abetting (18 U.S.C. §§ 1343 and 2) |
| | Counts Eleven – Twenty-One: Aiding and Assisting in Filing False Tax Returns (26 U.S.C. § 7206(2)) |
| | Forfeiture Allegation: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.      Defendant, Daniel J. GRIFFIN, was a resident of Belmont, Massachusetts.  From approximately 2011 through 2019, GRIFFIN was the Lieutenant and commanding officer of the Traffic Programs Section ("TPS") of the Massachusetts State Police ("MSP"), based in Framingham, Massachusetts.  From 2015 through 2017, GRIFFIN collected yearly MSP salary, overtime, and other benefits of approximately $226,768, $223,227, and $224,570, respectively.

a.  GRIFFIN was the sole owner and operator of Knight Protection Services, ("KnightPro"), a private security business that provided art transportation and event security within and outside Massachusetts.  From 2012 through 2019, KnightPro collected gross receipts of nearly two million dollars.

b.  GRIFFIN incorporated KnightPro in or about 2000 and ran this side security business as the sole operator at least through 2019.  Through KnightPro, GRIFFIN hired dozens of independent contractors to (i) escort valuable art for museums and galleries throughout the United States; and (ii) provide security for campus events at local Massachusetts universities.

c.  As KnightPro's sole operator, GRIFFIN was responsible for drafting bids and sending job invoices to customers; recruiting and scheduling contractors; managing all logistics for his contractors, including air travel reservations, hotel bookings, and rental car services; maintaining customer relations; and handling all KnightPro bookkeeping, including collecting receipts, recording revenue, and paying expenses (e.g., travel expenses, contractor pay).  Because of these responsibilities, GRIFFIN often treated KnightPro as a full-time job, spending significant time doing KnightPro business, including during hours that GRIFFIN collected MSP regular pay and TPS Overtime pay over the course of the TPS Overtime conspiracy, described in more detail below.[1]

---

[1] During approximately the end of 2017 through most of 2018, GRIFFIN was out on MSP injury pay.  During this period, GRIFFIN still approved false overtime pay entries and obtained additional overtime funding from the Executive Office of Public Safety & Security, described in further detail below.  Further, while GRIFFIN collected his full MSP salary, GRIFFIN continued to conduct KnightPro business throughout this period.

d. GRIFFIN also owned rental property in Belmont. From 2011 through 2020, GRIFFIN collected gross rent receipts of approximately over four hundred thousand dollars.

e. From at least in or about 2011 to 2019, GRIFFIN also was the part owner of several Boston area gyms from which he received income.

2. Defendant William W. ROBERTSON was a resident of Westborough, Massachusetts. From approximately 2008 to September 2018, ROBERTSON was a Sergeant in TPS. From 2015 through 2017, ROBERTSON collected yearly MSP salary, overtime, and other benefits of approximately $178,221, $173,385, and $175,361, respectively.

3. MSP received over $10,000 of federal grant money in each calendar year from 2015 to 2017 from the National Highway Traffic Safety Administration ("NHTSA"), a federal agency within the U.S. Department of Transportation ("DOT"), to fund traffic safety enforcement in Massachusetts. As the TPS commanding officer, GRIFFIN applied for, and received, hundreds of thousands of dollars in federal grant monies to fund overtime traffic safety initiatives such as Click-it-or-Ticket ("CIOT"), Distracted Driving ("DD"), Sustained Traffic Enforcement Programs ("STEP"), and Breath-Alcohol-Testing checkpoints ("BAT Checkpoints") (altogether, "TPS Overtime").

a. MSP troopers that worked TPS Overtime received pay at the overtime rate, which was one and one-half times that trooper's regular pay rate. In 2017, GRIFFIN's and ROBERTSON's overtime pay rate was approximately $109.71/hour and $91.19/hour, respectively.

b. TPS Overtime pay was included in MSP's bi-weekly payroll distributions to GRIFFIN, ROBERTSON, and their coconspirators. MSP payroll was processed

3

by a Boston-based, national bank, which required interstate and foreign wire communications to effect such payroll distributions.

c.  Because CIOT, DD, STEP, and BAT Checkpoints were overtime shifts, each MSP trooper receiving overtime pay for these assignments was required to work the duration of shift, *i.e.*, four hours work to receive four hours overtime pay, and so forth.  CIOT, DD, and STEP overtime shifts were usually scheduled on weekdays in four-hour overtime blocks, beginning at 3:30 p.m. and ending at 7:30 p.m.  BAT Checkpoints were usually scheduled for late Friday night and Saturday night in seven, eight, or nine-hour overtime blocks, beginning at 7:00 p.m. or 8:00 p.m.

d.  GRIFFIN, ROBERTSON, and other TPS troopers working TPS Overtime were required to make, keep, and maintain accurate and complete records related to these shifts.  These records included PayStation entries (shift description and hours worked), SP-637 forms (individual trooper activity during an overtime shift, *e.g.*, citation numbers, type, and time of day issued), and other records to document that federal grant monies were properly being used to fund these traffic safety overtime programs.

4.    "Trooper 1," "Trooper 2," and "Trooper 3" (altogether, "Troopers 1-3") were members of TPS at various times during the period from approximately 2015 to 2019.  The MSP work schedule for defendants GRIFFIN and ROBERTSON, and Troopers 1-3 was Monday through Friday, from 7:00 a.m. to 3:30 p.m.

## Object and Purpose of the Conspiracy

5.     The object of the conspiracy was to embezzle, steal, convert, misapply, and obtain by fraud and without authority more than $5,000 in MSP funds on a yearly basis.  The purpose of the conspiracy was to enrich GRIFFIN, ROBERTSON and their coconspirators personally.

## Manner and Means of the Conspiracy

6.     Among the manner and means by which defendants GRIFFIN, ROBERTSON, Troopers 1-3, and coconspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

> a.  GRIFFIN, ROBERTSON, and their coconspirators would purposely arrive late to, and leave early from, TPS Overtime shifts on a regular basis.
>
> b.  For TPS Overtime shifts that ran from 3:30 p.m. to 7:30 p.m. (*e.g.*, DD, CIOT, STEP), GRIFFIN, ROBERTSON, and their coconspirators would begin the TPS Overtime shift during their normal work hours (*e.g.*, 2:00 p.m. to 3:00 p.m.), issue citations for approximately one and one half to two hours, and then leave for home.
>
> c.  For BAT Checkpoint overtime shifts that ran from 7:00 p.m. or 8:00 p.m. to 4:00 a.m. or 5:00 a.m., GRIFFIN, ROBERTSON, and their coconspirators would begin the shift late by approximately one hour or more, man the BAT Checkpoint until approximately 2:00 a.m. or earlier, and then leave for home.
>
> d.  GRIFFIN chose enforcement locations conducive to the fraud.  For TPS Overtime shifts that GRIFFIN and his coconspirators started during their normal work hours (*e.g.*, DD, CIOT, STEP), GRIFFIN chose a location close to the TPS offices in Framingham.  For BAT Checkpoints during summer months, GRIFFIN often

designated enforcement locations near the Cape so that GRIFFIN would be closer to his second home that he owned on the Cape (the "Cape House").

e.  To create the impression that GRIFFIN, ROBERTSON, and his coconspirators were working full TPS Overtime shifts, GRIFFIN and ROBERTSON ensured that all coconspirators entered the same false number of hours worked on PayStation, *e.g.*, four or eight hours, depending on the shift.

f.  To further conceal the overtime fraud, GRIFFIN directed coconspirators to falsify SP-637 Forms by entering false citation times to make it appear as if GRIFFIN and his coconspirators were working the full four-hour overtime shift for a CIOT, DD, or STEP assignment, instead of leaving early.

g.  GRIFFIN submitted false documentation to the Executive Office of Public Safety & Security ("EOPSS"), the Massachusetts state entity that administers federal grant money for highway safety, which contained false overtime hour entries for GRIFFIN and his coconspirators.

h.  In order to conceal and sustain the overtime fraud, GRIFFIN, ROBERTSON, and their coconspirators, shredded key records and burned SP-637 forms.

Overt Acts in Furtherance of the Conspiracy and Acts in Furtherance of the Overtime Scheme to Defraud

7.      From at least as early as 2015 through in or about 2018, GRIFFIN, ROBERTSON, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

a.  On or about January 31, 2015, during a BAT Checkpoint (8:00 p.m. to 4:00 a.m.) in Medford, GRIFFIN directed his coconspirators to leave the shift approximately

two hours early and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked until the end of the shift.

b.  On or about April 16, 2015, during a DD overtime shift (3:30 p.m. to 7:30 p.m.) in Framingham, GRIFFIN directed his coconspirators to leave the shift at least two hours early and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked until the end of the shift.

c.  On or about February 19, 2016, during a BAT Checkpoint (8:00 p.m. to 4:00 a.m.) in Holden, GRIFFIN directed Troopers 2, 3, and other coconspirators to leave the shift at least two hours early and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked until the end of the shift.

d.  On or about February 20, 2016, during a BAT Checkpoint (8:00 p.m. to 4:00 a.m.) in Middleborough, GRIFFIN directed ROBERTSON, Troopers 2, 3, and other coconspirators to leave the shift at least two to three hours early and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked until the end of the shift.

e.  On or about March 11, 2016, during a BAT Checkpoint (7:00 p.m. to 5:00 a.m.) in Springfield, GRIFFIN directed ROBERTSON and other coconspirators to leave the shift at least two to three hours early and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked until the end of the shift.

f.  On or about April 14, 2016, during a DD overtime shift (3:30 p.m. to 7:30 p.m.) in Framingham, GRIFFIN directed Trooper 3 and other coconspirators to begin the DD overtime shift during their regular work hours (before 3:00 p.m.), leave the DD

7

overtime shift before 4:30 p.m., and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked the duration of the shift.

g.  On or about April 14, 2016, at GRIFFIN's direction, Trooper 3 made false entries on the SP-637 form for the DD overtime shift to make it appear as if Trooper 3 worked the duration of the shift to 7:30 p.m.

h.  On or about April 19, 2016, during a DD overtime shift (3:30 p.m. to 7:30 p.m.) in Framingham, GRIFFIN directed ROBERTSON and Troopers 1 and 2 to begin the DD overtime shift during their regular work hours (before 3:00 p.m.), leave the DD overtime shift before 4:30 p.m., and make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked the duration of the shift.

i.  On or about April 21, 2016, during a DD overtime shift (3:30 p.m. to 7:30 p.m.) in Framingham, GRIFFIN directed ROBERTSON and Troopers 1 and 3 to begin the DD overtime shift during their regular work hours (before 3:00 p.m.), leave the DD overtime shift before 4:30 p.m., and make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked the duration of the shift.

j.  On or about June 9, 2016, GRIFFIN emailed another trooper to tell him to report to a June 11, 2016 BAT Checkpoint in Brighton one and one-half hours late (10:30 p.m.), but to falsely enter into PayStation that the trooper had worked from 9:00 p.m. to 4:00 a.m.

k.  On or about June 30, 2016, GRIFFIN submitted a report to EOPSS to document funds drawn from an approximately $275,000 DD grant to pay trooper overtime for the period of April 12 to April 29, 2016.  GRIFFIN reported that approximately $273,410 was used to fund 2552 hours of overtime and other costs, knowing that

the report falsely overstated the hours that GRIFFIN and his coconspirators had actually worked.

l.  On or about July 16, 2016, during a BAT Checkpoint (8:00 p.m. to 5:00 a.m.) in Yarmouth, GRIFFIN directed Troopers 1, 3, and other coconspirators to leave the shift at least two to three hours early and to make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked until the end of the shift.

m.  On or about April 18, 2017, during a DD overtime shift (3:30 p.m. to 7:30 p.m.) in Framingham, GRIFFIN directed Trooper 3 and other coconspirators to begin the DD overtime shift during their regular work hours (before 3:00 p.m.), leave the DD overtime shift before 4:30 p.m., and make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked the duration of the shift.

n.  On or about April 18, 2017, at GRIFFIN's direction, Trooper 3 made false entries on the SP-637 form for the DD overtime shift to make it appear as if Trooper 3 worked the duration of the shift to 7:30 p.m.

o.  On or about May 9, 2017, during a CIOT overtime shift (3:30 p.m. to 7:30 p.m.) in Framingham, GRIFFIN directed Trooper 3 and other coconspirators to begin the CIOT overtime shift during their regular work hours (before 3:00 p.m.), leave the CIOT overtime shift before 4:30 p.m., and make false PayStation entries to make it appear as if GRIFFIN and his fellow troopers had worked the duration of the shift.

p.  On or about May 9, 2017, at GRIFFIN's direction, Trooper 3 made false entries on the SP-637 form for the CIOT overtime shift to make it appear as if Trooper 3 worked the duration of the shift to 7:30 p.m.

q.  On or about May 25, 2017, GRIFFIN submitted a report to EOPSS to document
    funds drawn from a $275,000 DD grant to pay trooper overtime for the period of
    April 7 to April 28, 2017.   GRIFFIN reported that approximately $236,929 was
    used to fund 2552 hours of overtime and other costs, knowing that the report falsely
    overstated the hours that GRIFFIN and his coconspirators had actually worked.

r.  On or about August 8, 2017, during a STEP overtime shift (3:30 p.m. to 7:30 p.m.)
    in Framingham, GRIFFIN directed ROBERTSON, Trooper 1, and Trooper 3 to
    begin the STEP overtime shift during their regular work hours (before 3:00 p.m.),
    leave the STEP overtime shift before 4:30 p.m., and make false PayStation entries
    to make it appear as if GRIFFIN and his fellow troopers had worked the duration
    of the shift.

s.  On or about August 9, 2017, during a STEP overtime shift (3:30 p.m. to 7:30 p.m.)
    in Framingham, GRIFFIN directed ROBERTSON, Trooper 1, and Trooper 3 to
    begin the STEP overtime shift during their regular work hours (before 3:00 p.m.),
    leave the STEP overtime shift before 4:30 p.m., and make false PayStation entries
    to make it appear as if GRIFFIN and his fellow troopers had worked the duration
    of the shift.

t.  On or about September 13, 2017, during a STEP overtime shift (3:30 p.m. to 7:30
    p.m.) in Framingham, GRIFFIN directed ROBERTSON and Trooper 1 to begin the
    STEP overtime shift during their regular work hours (before 3:00 p.m.), leave the
    STEP overtime shift before 4:30 p.m., and make false PayStation entries to make it
    appear as if GRIFFIN and his fellow troopers had worked the duration of the shift.

10

u.  In or about late 2017, after news outlets began to publicly report MSP Troop E overtime abuse, ROBERTSON ordered Trooper 1 to shred a folder that contained SP-637 forms because they contained incriminating records that could reveal the ongoing TPS Overtime fraud scheme.

v.  On or about April 7, 2018, during a BAT Checkpoint (8:00 p.m. to 4:00 a.m.) in Raynham, ROBERTSON, Troopers 1, 2, and other coconspirators left the shift at least two to three hours early and made false PayStation entries to make it appear as if ROBERTSON and his fellow troopers had worked until the end of the shift.

w.  In or about late 2018, after several MSP Troop E troopers had been arrested and charged with overtime fraud, Trooper 1 took another folder of SP-637 forms to his home and burned them to prevent detection of the scheme.  When informed of Trooper 1's destruction, ROBERTSON replied, in sum and substance: "Good."

### Other Acts of Concealment

8.  After an internal MSP inquiry regarding missing SP-637 forms, on or about July 29, 2019, GRIFFIN submitted a memo to his MSP superiors that was designed to mislead them by claiming that missing SP-637 forms were "inadvertently discarded or misplaced" during office moves.

9.  In or about September/October 2020, after learning of the federal grand jury investigation into TPS, GRIFFIN told Trooper 1, in sum and substance: "Don't tell them [federal investigators] fucking anything."

### Embezzlement Totals from 2015 to 2017

10.  From 2015 to 2017, GRIFFIN, ROBERTSON, and the below coconspirators made and caused to be made false overtime entries in order to fraudulently collect the following TPS Overtime pay (all figures approximate), as follows:

|  | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|
| GRIFFIN | $18,600.00 | $22,338.75 | $20,083.25 | $61,022.00 |
| ROBERTSON | $7,843.50 | $12,012.00 | $11,898.25 | $31,753.75 |
| Trooper 1 | *[2] | $7,068.75 | $9,730.50 | $16,799.25 |
| Trooper 2 | * | $4,898.25 | $3,558.75 | $8,457.00 |
| Trooper 3 | $6,845.00 | $8,112.00 | * | $14,957.00 |
| Subtotals | $33,288.50 | $54,429.75 | $45,270.75 | $132,989.00 |

### GRIFFIN's School Wire Fraud Scheme

11.     From at least as early as 2013 through 2019, GRIFFIN had two children that, at various times, attended a private school in Belmont, Massachusetts (the "Private School"). The Private School charged yearly tuition that ranged from approximately $39,600/year in 2013 to approximately $50,800/year in 2019. On a case by case basis, the Private School would grant financial aid to certain families based upon financial need and other factors.

12.     To apply for financial aid, a family was required to electronically submit a Parent Financial Statement ("PFS") to the Private School for each academic year. In the PFS, the applicant family was required to truthfully and accurately disclose its income, assets, and other relevant information. The Private School would then rely upon and use information from the PFS as part of its financial aid decision. The information in the PFS was electronically processed and stored by third party vendors, based in California and Illinois, respectively, which would then transmit the information electronically to the Private School.

13.     From 2013 through 2019, GRIFFIN made materially false PFS submissions to the Private School by omitting hundreds of thousands of dollars in income from KnightPro; submitting false tax return documents; understating hundreds of thousands of dollars in assets (*e.g.*, retirement

---

[2] Fields marked by an asterisk indicate that certain underlying data necessary for computations had not been produced and/or was unavailable as of the date of this Indictment.

accounts, 529 college savings accounts, bank accounts, and financial gifts from relatives); and

concealing other assets such as the Cape House from the Private School.  In total, GRIFFIN

obtained approximately $176,700 in financial aid from the Private School during the period that

he submitted fraudulent documentation to the institution.

14.     Examples of GRIFFIN's false PFS submissions to the Private School are as follows (all

figures and dates approximate):

| Academic Year (GRIFFIN PFS submission date) | 2016-2017 (1/3/2016) | 2017-2018 (1/3/2017) | 2018-2019 (1/3/2018) | 2019-2020 (11/20/2018) |
|---|---|---|---|---|
| PFS-Reported KnightPro gross receipts (prior yr) | $226,700 | $136,805 | $153,591 | $104,533 |
| Actual KnightPro gross receipts (prior yr) | $228,897 | $233,739 | $155,040 | $194,422 |
| PFS-Reported KnightPro bank account holdings | $0 | $5,902 | $7,190 | $6,000 |
| Actual KnightPro bank account balance | $242,136 | $263,888 | $238,701 | $192,555 |
| PFS-Reported retirement account holdings | $12,000 | $15,000 | $18,000 | $20,000 |
| Actual retirement account holdings | $75,291 | $181,759 | $214,641 | $204,812 |
| PFS-Reported checking/savings account holdings | $47,000 | $58,000 | $61,000 | $57,000 |
| Actual checking/savings account holdings | $164,008 | $167,686 | $183,133 | $158,603 |
| PFS-Reported 529 savings account holdings | $0 | $0 | $0 | $132,000 |
| Actual 529 account holdings | $237,832 | $266,776 | $254,847 | $258,127 |

15.     Further, in or about April 2017, after learning that one of his children would only be receiving $28,750 in financial aid from the Private School for the 2017-2018 academic year, GRIFFIN sent a series of emails to the Private School financial aid office complaining that he was being penalized for being honest about his financial means; that other families were abusing the system by "hid[ing] monies … and mak[ing] significant cash 'under the table'"; and that he would have to withdraw his child from the Private School unless further financial aid was given.

16.     Despite having hundreds of thousands of dollars in available income and assets to pay the full Private School tuition for the 2017-2018 academic year, GRIFFIN's false email campaign was successful in obtaining an additional $4,000 in financial aid from the Private School for the upcoming academic year.

GRIFFIN's False Tax Returns

17.     The Internal Revenue Service ("IRS") is an agency of the United States Department of Treasury responsible for enforcing and administering the tax laws of the United States.

18.     In addition to being the sole owner and operator of KnightPro, GRIFFIN also aided and assisted in the preparation of (i) KnightPro's corporate income tax returns on IRS Forms 1120; and (ii) his joint personal income tax returns on IRS Forms 1040, by submitting KnightPro financial worksheets (*e.g.*, trial balance, general ledger, and other QuickBooks reports), MSP W-2 forms, and other pay records, to a tax preparer ("Tax Preparer"), and meeting with the Tax Preparer on a yearly basis.

19.     From at least as early as 2012 through 2019, GRIFFIN concealed hundreds of thousands of dollars of KnightPro income from the Tax Preparer and the IRS by underreporting KnightPro revenue on the IRS Forms 1120 as follows (all figures approximate):

| Tax Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Totals |
|---|---|---|---|---|---|---|---|---|---|
| KnightPro receipts reported by Griffin on Form 1120 | $193,619.00 | $162,156.00 | $226,767.00 | $136,805.00 | $153,591.00 | $104,533.00 | $135,968.00 | $88,524.00 | $1,201,963.00 |
| Actual KnightPro receipts per KnightPro bank records | $313,581.34 | $286,765.50 | $347,379.50 | $228,897.00 | $233,739.69 | $155,040.00 | $194,422.27 | $169,850.28 | $1,929,675.58 |
| Unreported KnightPro receipts | $119,962.34 | $124,609.50 | $120,612.50 | $92,092.00 | $80,148.69 | $50,507.00 | $58,454.27 | $81,326.28 | $727,712.58 |

20.    To conceal income, GRIFFIN – the sole authorized signatory on the KnightPro bank account – funneled thousands of dollars from the KnightPro account to his personal accounts in order to pay personal expenses, including private school tuition, car payments, golf club expenses, and expenditures for his Cape House.   GRIFFIN also submitted fraudulent financial worksheets to his Tax Preparer in which GRIFFIN omitted KnightPro income that GRIFFIN had siphoned for personal use.

21.    As shown below, GRIFFIN made KnightPro bank transfers to his personal accounts each year; and aside from 2015, reported that KnightPro either lost money or made zero net income, as follows (all figures approximate):

| Tax Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Totals |
|---|---|---|---|---|---|---|---|---|---|
| KnightPro transfers to GRIFFIN personal accounts | $56,600 | $57,000 | $25,600 | $10,445 | $45,400 | $50,000 | $63,850 | $100,242 | $409,137 |
| KnightPro taxable income/(loss) reported by GRIFFIN to IRS | ($2717) | ($3424) | $0 | $3094 | ($7848) | ($123) | ($4669) | ($10475) | ($26,162) |

22.   Despite the fact that GRIFFIN was regularly transferring money from the KnightPro bank account to his personal accounts for each above Tax Year, GRIFFIN (i) falsely reported on his corresponding Forms 1120 that he received no KnightPro salary or dividend income; and (ii) fraudulently omitted KnightPro deposits from his income on his joint personal income tax returns Forms 1040 for each corresponding Tax Year.

23.   GRIFFIN also concealed income by inflating KnightPro expenses in instances where GRIFFIN used KnightPro funds to (i) pay for Red Sox tickets that GRIFFIN often resold or used for personal use; and (ii) pay a person to do housecleaning at GRIFFIN's personal residence.   In other instances, GRIFFIN falsely claimed KnightPro expenses for out-of-state travel expenditures for which he was reimbursed by MSP.

## COUNT ONE
Conspiracy to Commit Theft Concerning a Program Receiving Federal Funds
(18 U.S.C. § 371)

The Grand Jury charges:

24.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 10 and 18 to 23 of this Indictment.

25.     From at least as early as 2015 through in or about 2018, in the District of Massachusetts, and elsewhere, the defendants,

(1) DANIEL J. GRIFFIN and
(2) WILLIAM W. ROBERTSON,

conspired with each other and with others known and unknown to the Grand Jury to commit an offense against the United States, to wit, being agents of an organization, namely, MSP, to embezzle, steal, obtain by fraud and otherwise without authority knowingly convert to the use of a person other than the rightful owner and intentionally misapply, property valued at $5,000 or more, which included labor, services, funds, and other goods, that was owned by, and was under the care, custody, and control of such organization, MSP, which received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance in any one-year period between 2015 and 2018, in violation of Title 18, United States Code, Section 666(a)(1)(A).

All in violation of Title 18, United States Code, Section 371.

COUNT TWO
Theft Concerning a Program Receiving Federal Funds; Aiding and Abetting
(18 U.S.C. §§ 666(a)(1)(A) and 2)

The Grand Jury further charges:

26.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 10 and 18 to 23
of this Indictment.

27.      From in or about 2016 through in or about 2017, in the District of Massachusetts, and
elsewhere, the defendants,

(1) DANIEL J. GRIFFIN and
(2) WILLIAM W. ROBERTSON,

being agents of an organization, namely, MSP, embezzled, stole, obtained by fraud and otherwise
without authority knowingly converted to the use of a person other than the rightful owner and
intentionally misapplied, property valued at $5,000 or more, which included labor, services, funds,
and other goods, that was owned by, and was under the care, custody, and control of such
organization, MSP, which received benefits in excess of $10,000 under a Federal program
involving a grant, contract, subsidy, loan guarantee, insurance or other form of Federal assistance
in any one-year period between 2016 and 2017.

All in violation of Title 18, United States Code, Sections 666(a)(1)(A) and 2.

18

COUNTS THREE - SIX
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

The Grand Jury further charges:

28.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 to 10 and 18 to 23

of this Indictment.

29.     On or about the dates below, in the District of Massachusetts, and elsewhere, the

defendants,

(1) DANIEL J. GRIFFIN and
(2) WILLIAM W. ROBERTSON

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of materially false and fraudulent pretenses, representations, and promises,

did transmit and cause to be transmitted by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme

to defraud MSP, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 3 | May 6, 2016 | A payroll direct deposit to GRIFFIN's bank account that included $5498.74 in overtime pay for the period from April 17-April 30, 2016 from the Commonwealth of Massachusetts, with such payroll processed by a Boston-based bank via servers in Mexico and other locations outside Massachusetts. |
| 4 | August 25, 2017 | A payroll direct deposit to GRIFFIN's bank account that included $3949.57 in overtime pay for the period from August 6-August 19, 2017 from the Commonwealth of Massachusetts, with such payroll processed by a Boston-based bank via servers in Mexico and other locations outside Massachusetts. |

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 5 | May 6, 2016 | A payroll direct deposit to ROBERTSON's bank account that included $5405.35 in overtime pay for the period from April 17-April 30, 2016 from the Commonwealth of Massachusetts, with such payroll processed by a Boston-based bank via servers in Mexico and other locations outside Massachusetts. |
| 6 | August 25, 2017 | A payroll direct deposit to ROBERTSON's bank account that included $3191.57 in overtime pay for the period from August 6-August 19, 2017 from the Commonwealth of Massachusetts, with such payroll processed by a Boston-based bank via servers in Mexico and other locations outside Massachusetts. |

All in violation of Title 18, United State Code, Sections 1343 and 2.

COUNTS SEVEN - TEN
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

The Grand Jury further charges:

30.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 and 11 to 23 of this Indictment.

31.    On or about the approximate dates below, in the District of Massachusetts, and elsewhere, the defendant,

(1) DANIEL J. GRIFFIN,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud the Private School, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 7 | January 3, 2016 | GRIFFIN's online PFS submission which traveled interstate via third-party software platforms and servers outside of Massachusetts to the Private School in Massachusetts. |
| 8 | January 3, 2017 | GRIFFIN's online PFS submission which traveled interstate via third-party software platforms and servers outside of Massachusetts to the Private School in Massachusetts. |
| 9 | January 3, 2018 | GRIFFIN's online PFS submission which traveled interstate via third-party software platforms and servers outside of Massachusetts to the Private School in Massachusetts. |
| 10 | November 20, 2018 | GRIFFIN's online PFS submission which traveled interstate via third-party software platforms and servers outside of Massachusetts to the Private School in Massachusetts. |

All in violation of Title 18, United State Code, Sections 1343 and 2.

21

COUNTS ELEVEN – TWENTY-ONE
Aiding and Assisting in Filing False Tax Returns
(26 U.S.C. § 7206(2))

The Grand Jury further charges:

32.     The Grand Jury re-alleges and incorporates by reference paragraphs 1, and 11 to 23 of this Indictment.

33.     On or about the dates set forth below, in the District of Massachusetts and elsewhere, the defendant,

(1) DANIEL J. GRIFFIN,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax Returns, Forms 1040, and U.S. Corporation Income Tax Returns, Forms 1120, for the following tax years, which Returns were false and fraudulent as to a material matter in that each Return understated defendant GRIFFIN's income and KnightPro's total revenue, respectively, as a result of which each Return understated the amount of taxes due and owing for each applicable year.

| Count | Tax Year | IRS Form | Appx. Filing Date |
|-------|----------|----------|-------------------|
| 11 | 2014 | 1040 | 4/14/2015 |
| 12 | 2015 | 1040 | 4/16/2016 |
| 13 | 2016 | 1040 | 5/25/2017 |
| 14 | 2017 | 1040 | 4/15/2018 |
| 15 | 2018 | 1040 | 6/18/2019 |
| 16 | 2014 | 1120 | 9/15/2015 |
| 17 | 2015 | 1120 | 9/13/2016 |
| 18 | 2016 | 1120 | 10/8/2017 |
| 19 | 2017 | 1120 | 4/18/2018 |
| 20 | 2018 | 1120 | 10/10/2019 |
| 21 | 2019 | 1120 | 7/15/2020 |

All in violation of Title 26, United States Code, Section 7206(2).

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 371, 666, 1343, and 2, set forth in Counts One through Ten, the defendants,

(1) DANIEL J. GRIFFIN and
(2) WILLIAM W. ROBERTSON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

2.    If any of the property described in Paragraph 1, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

DUSTIN CHAO
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: December 10, 2020
Returned into the District Court by the Grand Jurors and filed.

/s/ Dawn M. King 4:49pm
DEPUTY CLERK