UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:20-cr-10319-MRG |
| | ) | |
| DANIEL GRIFFIN | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM
AND REQUEST FOR DOWNWARD DEPARTURE AND VARIANCE**

## I.      INTRODUCTION

The United States Sentencing Guidelines, as interpolated by Probation and applied to the Statement of Facts supplied by the government, call for the defendant Griffin to be sentenced to a period of incarceration of 57 to 71 months. This sentence is roughly *twenty-five (25) times* greater than the sentence received by all but one similarly situated, District of Massachusetts, law enforcement defendant. The defendant's proposed sentence is *five (5) times more* than the sentence received by the remaining, similarly-situated law enforcement defendant – who also went to trial, though in whole, not in part as did Griffin. This state of affairs is not justice and the Court can do much to remedy that under the law.  The Court has a little power to affect the almost four and a half ($4,500,000.00) million-dollar personal financial loss his conduct will have caused to himself, to his wife, and to his children.

This memorandum initially addresses the United States Sentencing Guideline (U.S.S.G.) issues, then moves to departures and variances, and finally, begs the Court's discretion.

Although the guidelines are the starting point in determining any sentence, they cannot be presumed reasonable and are only one of a number of factors properly considered at sentencing under 18 U.S.C. §3553(a). *See Gall v. United States*, 552 U.S. 38, 50 (2007). As the First Circuit has stressed, the Supreme Court's ruling in *Kimbrough* requires a "more holistic inquiry" than

1

simply plugging numbers into a guidelines calculation, and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d. 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).   That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*.  In reaching a decision as to what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *Id*.

Here, a non-guideline sentence is warranted.

## II. GUIDELINE ISSUES

### A. GROUPING: THE GUIDELINES REQUIRE THREE GROUPS, NOT TWO

The defendant's indictment charged him in twenty-one (21) counts. Counts 1-6 may be characterized as the "TPS" counts, pertaining to conduct involved the Massachusetts State Police and related monies. Counts 7-10 may be denoted the "BHS" counts as related to financial aid applications for the Belmont Hill School. Finally, Counts 11-21 are the "Tax' counts, strictly related to tax issues concerning the defendant's business and personal tax returns. The Presentence Report proposes a grouping of the counts into only two groups: (1) Counts 1-10 and (2) Counts 11-21. The defendant asserts that the groups should be *three* in number: (1) Counts 1-6 ("TPS Counts"); (2) Counts 7-10 ("BHS Counts"); and (3) Counts 11-21 ("Tax Counts"). As reasons, the defendant argues that the USSG provides guidance as to grouping as follows: "All counts involving ***essentially the same harm*** shall be grouped together within a single Group...

- "When counts involve the *same victim and the same act or transactions*." USSG § 3D1.2(a).

- "When counts involve the *same victim* and two or more acts or transactions connected by a common criminal objectively or constituting part of *common scheme or plan*." USSG § 3D1.2(b).

The Presentence Report itself notes that the TPS Counts and the BHS Counts each involve *different victims*—not one and the same victim. *See* Presentence Report ¶ 29 ("the victims in this instance are Belmont Hill School, the IRS, and the U.S. Department of Transportation (U.S. DOT))." Indeed, the government's Statement of Facts made it clear that the *objectives were different*. The alleged objective concerning the TPS Counts was to extract federal funds for work not performed. To the contrary, the objective concerning the BHS Counts was to increase the financial aid for the defendant's children. Thus, both the two victims and the two objectives were completely different and have no logical relation.

USSG §3D1.2(d), which provides for grouping "when the offense level is determined largely on the basis of the total amount of harm or loss," does not support Probation's two-group rather than the defendant's three because that one section in isolation is a net that sweeps too broadly in light of the purpose of subsections (a) and (b). Indeed, the principal purpose for USSG §3D1.2 is to group "closely related counts" involving "substantially the same harm." *See* USSG §3D1.2; *see also United States v. Siddons*, 660 F.3d 699, 706 (3d Cir. 2011).[1] Courts have routinely held that USSG §3D1.2(d) does not provide for *automatic* grouping of counts on the "to be grouped" list. *See United States v. Williams*, 154 F.3d 655, 657 (6th Cir. 1998) ("The bulk of the courts to have considered the proper construction of subsection (d) have concluded that there is no automatic group of counts simply because those counts are on the 'are to be grouped' list."). Belmont Hill and TPS are entirely different "schemes" with entirely different purposes.

---

[1] The §3D1.2 Commentary itself added that: "A primary consideration in this section is whether the offenses involve different victims."

The underlying policy considerations for that compelling choice are similar if not the same as the considerations requiring that tax counts be separated for grouping purposes. *See United States v. Martin*, 363 F.3d 25, 41-44 (1st Cir. 2004); *United States v. Lombardi*, 5 F.3d 568, 57 (1st Cir. 1993).

In response to the defendant's objection to the Presentence Report, Probation argues that offenses under USSG §2B1.1 are automatically grouped together based on the language of USSG §3D1.2(d). Probation reasons that it would be hesitant to rely on *Williams* (cited above holding that there is no automatic grouping of offenses under §3D1.2(d)), because "[t]his section of the guideline book has been updated eight times since the 1998 Sixth Circuit case." *See* Presentence Report at 35. *Howeve*r, USSG §3D1.2(d) has remained ***completely unchanged*** since 1998. *Compare* U.S. SENT'G COMM'N, GUIDELINES MANUAL §3D1.2 (Nov. 2023); *with* U.S. SENT'G COMM'N, GUIDELINES MANUAL §3D1.2 (Nov. 1998).

In fact, since 1998, numerous courts have restated the holding that USSG §3D1.2(d) does not provide for automatic grouping of counts on the list. *Milhouse v. United States*, No. 2:15-CV-489-WKW, 2017 WL 2456991, at *4 (M.D. Ala. May 4, 2017) ("grouping is not automatic even where the applicable guidelines are included in this list"); *United States v. Reg*., 678 F.3d 1262, 1267 (11th Cir. 2012) ("grouping is not automatic even if all of the applicable guidelines are included in this list"); *United States v. Lopez-Urbina*, 434 F.3d 750, 763 (5th Cir. 2005) ("grouping is not mandatory or automatic simply because a defendant is charged with an offense that falls under a guideline listed in §3D1.2(d)."); *United States v. Goncalves*, 613 F.3d 601, 605–06 (5th Cir. 2010) ("no per se rule exists" for automatic grouping of counts); *United States v. Lenoci*, 377 F.3d 246, 252 (2d Cir. 2004) ("The first interpretation, namely, that we are to

4

group all offenses in the 'to be grouped' list, has been rejected by most courts that have considered the issue and also poses practical difficulties of aggregation.").

Accordingly, because USSG §3D1.2 provides for grouping only where the counts are closely related, three groups, rather than two, is the appropriate path.

### B. NEITHER GAIN NOR LOSS CAN BE DETERMINED AS TO BELMONT HILL SCHOOL

The defendant has pleaded guilty to an offense which may be characterized as financial aid fraud, *i.e.*, Counts 7-10 of the indictment. Any issues regarding the elements of the offense, *e.g.* materiality, differ from the question of how that plea to those four specific counts is to be treated under the Guidelines for sentencing purposes. In its Statement of Facts, the government asserted that: (1) the defendant misrepresented his income and assets on his financial aid applications to Belmont Hill School, (2) he received $176,700 in financial aid from the Belmont Hill School from 2013 through 2021, and (3) he would not have received that entire sum but for the fraudulent submissions. Presentence Report at ¶ 28. Based upon the government's representation, Probation initially determined that the defendant had caused the Belmont Hill School a loss in the amount of the full $176,700 and used that figure both for its loss calculations under §2B1.1 and for its restitution calculations. Presentence Report at ¶¶ 28-29, 35, 106. The defendant objected on causation grounds and cited relevant portions of the government's *Jencks* materials in which the appropriate representative of the Belmont Hill School stated that *the school could not determine* what, if any portion of the financial aid, would have been awarded or not awarded if the tax returns or other submissions had been accurate. Probation responded by changing the measure for §2B1.1 purposes from loss to gain and by letting the Court make a determination as to what, if any, portion regarding Belmont Hill School should be included in the restitution figure. *See* Presentence Report at 33. The defendant will first address the issue of

"loss" and then the issue of "intended gain" – after reviewing the government's burden of proof on this specific issue.

    **1.   Clear and Convincing Evidence is Required to Determine the BHS Loss**

    Typically, "[t]he government must prove the amount of loss by a preponderance of the evidence." *United States v. Flete-Garcia*, 925 F.3d 17, 28 (1st Cir. 2019) (citing U.S.S.G. §2B1.1). "But in some instances, a sentencing enhancement has an 'an extremely disproportionate impact on the sentence.'" *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022). In such cases, "Due Process may require at least proof by clear and convincing evidence where [] alleged relevant conduct has the potential to increase dramatically the defendant's sentence." *United States v. Patriarca*, 912 F. Supp. 596, 609 (D. Mass. 1995).

    When the loss enhancements dramatically increase a defendant's recommended Guidelines sentencing range, courts have routinely applied the clear and convincing evidentiary standard. *Lonich*, 24 F.4th at 910 (holding 22-level enhancement required clear and convincing evidence); *United States v. Valle*, 940 F.3d 473 (9th Cir. 2019) (holding that the clear and convincing standard applied when disputed enhancements led to an 11-level increase); *United States v. Gonzalez*, 492 F.3d 1031, 1039–40 (9th Cir. 2007) (requiring clear and convincing evidence when disputed enhancements resulted in a 9-level increase in offense level and raised Guidelines range "more than four times"); *United States v. Mezas de Jesus*, 217 F.3d 638, 643 (9th Cir. 2000) (applying the clear and convincing standard when challenged enhancements resulted in a 9-level increase and more than doubled original Guidelines range).

    Here, with no evidence to tether the gain or loss to the alleged BHS fraud, the PSR pegs the attributable gain or loss at $176,700, resulting in a ***10***-level enhancement under USSG

§2B1.1(b)(1)(F). Accordingly, the Court should apply a clear and convincing standard to the facts set forth at sentencing with respect to BHS. **Loss**

The government cannot meet its burden of proof regarding any loss, as *resulting from (or caused by)* the Belmont Hill School ("BHS") wire fraud allegations. "Actual loss is defined as the 'reasonably foreseeable pecuniary harm that resulted from the offense.'" *McBride v. United States*, No. 13-CR-10195-PBS, 2016 WL 6090716, at *2 (D. Mass. Oct. 18, 2016) (citing U.S.S.G. § 2B1.1, cmt. n. 3(A)(i)). "The amendment incorporates this causation standard that, at a minimum, requires factual causation (often called "but for" causation) and provides a rule for legal causation (i.e., guidance to the courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." *United States v. Curran*, 525 F.3d 74, 80–81 (1st Cir. 2008). "The Guidelines' loss rules thus "do[ ] not obviate the requirement to show that actual, defendant-caused loss occurred." *United States v. Lonich*, 23 F.4th 881, 916 (9th Cir. 2022). Thus, the government "has the burden to establish both cause in fact and legal causation by a preponderance of the evidence." *United States v. Peppel*, 707 F.3d 627, 644 (6th Cir. 2013).

In *United States v. Jimenez*, 946 F.3d 8, 13 (1st Cir. 2019), the court rejected the district court's loss calculation for a bank fraud defendant that considered the *entire* loan amount untethered to the fraud. The Court reasoned that "this formula well fits most cases in which fraud induced the making of the original loan" but "here, though, the original loans were presumably bona fide, and they were under-secured *before* the conspiracy was hatched through no fault of Jiménez." *Id.* Thus, the court restated the formula "by first estimating what the banks would have foreseeably realized but for the fraud." *Id*.

In the securities fraud context in *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005), the court overturned the district court's loss calculation that "did not take into account the impact of extrinsic factors on Dynegy's stock price decline." *Id*. The court reasoned that because the defendant's fraud did not render the company entirely worthless, the defendant cannot be responsible for the entire fall of the company's stock price. *Id*. at 547-48.

In *United States v. Lonich*, 23 F.4th 881, 918 (9th Cir. 2022), the Presentence Report sought a 20-level enhancement for a loss between $9.5 million and $25 million because defendants allegedly "caused the eventual failure and closure of SVB, which resulted in a loss totaling $20,120,000." *Id*. "That figure represented amounts the federal government allegedly lost because SVB failed." *Id*. The court rejected the 20-level enhancement, holding that "the government did not show by clear and convincing evidence that defendants *caused* SVB to fail." *Id*. (emphasis added).

These cases are instructive here. The government's Statement of Facts, and hence the Presentence Report, state that Griffin intentionally misrepresented his income and assets to BHS in order to receive hundreds of thousands of dollars in financial aid "***that he would not have otherwise received if he had submitted truthful financial information***." *See* Presentence Report at ¶28. Critically, while this is the standard the government must achieve, no evidence has been or can be adduced which will be sufficient to support its asserted conclusion. Instead, Probation, based upon the government's representation, simply calculates the loss of $176,700 as every dollar Griffin's family received in financial aid from BHS during the entire period Griffin's children were enrolled. However, this representation rests on the flawed assumption that Griffin's family would have received *no* financial aid had the reported income and assets been accurate, especially when, at the very least, Griffin's *three* children all become enrolled in

8

tuition-paying schools is a "main" factor positively influencing financial aid. Indeed, CJ Hacker told the government that "the number of children attending tuition paying schools" was a *main* financial aid consideration for BHS. (Interview dated 10/05/2020 by S/A LoStracco).

The government must prove the actual loss – that is, the amount of financial aid Griffin's family received *as a result of* the fraud. In other words, "but for" the fraud, Griffin would have only received a certain amount of financial aid. The Court must "correlate the defendant's sentence with the actual loss caused" and "exclusive of other sources." *Olis*, 429 F.3d at 547. It is not sufficient to attribute "bona fide" financial aid in the loss calculation. *Jimenez*, 946 F.3d at 13 (excluding "bona fide" loans originated prior to the conspiracy).

The government did not just fail to support causation in its loss calculation. It failed to acknowledge the critical evidence from its own *Jencks* materials which does not support any such conclusion. The government explored this issue carefully prior to trial, in both interviews and in grand jury presentations. It interviewed approximately five witnesses: CJ Hacker, Ayla Flanagan, Laura Garnett, Jaclyn Cummings, and Craig Dodson. Hacker and Flanagan from the Belmont Hill School were the two key witnesses for purposes of this issue.[2] Hacker was the Director of Financial Aid at BHS. Flanagan is the current Director of Financial Aid at BHS. When prompted, both Flanagan and Hacker stated that they were unable to determine how the financial aid award would be affected. Specifically, *Ms. Hacker* stated in an October 2020 interview that: "she would suspect, ***but does not know for certain***, that if she knew of these [accurate] figures it would have changed the amount Griffin's children were awarded." Further, when *Ms. Flanagan* testified in grand jury, a juror asked how the 2016-2017 financial aid award

---

[2] Laura Garnett, Jaclyn Cummings, and Craig Dodson were employees of School & Student Services, the company that administered the Parent Financial Statement.

would have been different if the numbers were accurate. Flanagan testified that "there is no way for me to know having not been there. Um, how it would have played out differently, because there are so many factors that go into it ... So I can't speak to the particulars of it." *See* Presentence Report at 32-33, including source-of-quote citations.

Not only is the evidence devoid of proof of the loss resulting from the alleged fraud (causation), but there is also a strong indication that the financial aid award would not have been affected very much had the defendant been completely transparent in his submissions. First, in the indictment, the government provides examples of Griffin's "misrepresentations" to BHS from 2016 to 2020 (four school years). In two out of the four school years exemplified in the indictment, Griffin underreported his Knight Pro *income* (the "largest lever" influencing financial aid according to CJ Hacker) by **$2,197** (2016-2017) and **$1,449** (2018-2019). This income discrepancy would almost certainly have had a negligible to zero effect on the financial aid received.

In addition, despite the government "making a big deal" out of Griffin's failure to report his children's 529 plans on the Parent Financial Statement, those plans were only legally allowed to be used for K-12 expenses as of 2018. Indeed, the Tax Cuts and Jobs Act passed in 2017 (taken into effect for the 2018 school year) was the ***first time*** 529 plans *ever* became useable for K-12 expenses. Prior to that time, it was exclusively a college-savings account. From 2013 through 2017, the bulk of the allegations against Griffin, his failure to report his children's 529 plans was inconsequential because it could not even be used to financially support them at BHS. ***What is more is that Griffin even began reporting the 529 plan on the BHS application in 2019-2020.*** Thus, the government has very real problems in meeting its high burden by clear and

convincing evidence that Griffin's alleged misrepresentations had any effect on the aid received, much less the entire award.

### 2. Gain

To its credit, in light of this causation problem with determining loss, Probation reversed course.[3] It amended the BHS restitution figure to "to-be-determined-by-the-Court." But, in determining the Guideline calculation, Probation has urged the Court to use the supposed gain that resulted from the offense as an alternative to the loss calculation. *See* Presentence Report at ¶ 33. According to Probation, the gain can be determined because "all of it was ultimately 'gained' based on fictious representations." *Id*.

However, this argument similarly fails because gain, as with loss, requires a causation analysis. The Guidelines state that "the court shall use the gain ***that resulted from the offense*** as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." *See* Application Note 3(B) (emphasis added). The plain language requires that the Court determine the gain to Defendant Griffin as a direct result of the misrepresentations to BHS, not the entire financial aid received. It is axiomatic that the phrase "resulting from" compels a causation analysis. *See, e.g., United States v. Yeaman*, 194 F.3d 442, 456–57 (3d Cir.1999) ("[T]he plain meaning of 'resulted from' connotes causation."); *United States v. Yihao Pu*, 814 F.3d 818, 824 (7th Cir. 2016) ("The phrase "result from" imposes a requirement of but-for causation."); *Burrage v. United States*, 571 U.S. 204 (2014) (holding when a statute does not define the phrase "result from," the court should give it its ordinary meaning, which is actual or but-for causation).

Courts in the analogous insider trading context (U.S.S.G. §2B1.4(b)) have routinely held that the "gain resulting from the offense" language requires a causation analysis excluding lawful

---

[3] And to be fair to the government, it did not advocate as to whether the total figure should be treated as loss or gain. It simply asserted that the entire number ($176,700) resulted from "intentional misrepresentations."

trading gains. In *United States v. Nacchio*, 573 F.3d 1062, 1072 (10th Cir. 2009), the court considered whether lawful trading gains as a part of an insider trading case should be figured into the gain calculation. The court held that they should not and reasoned that "because mere trading does not constitute criminal insider trading, it logically follows that any gain associated with lawful trading should not be considered gain as used to increase a prison sentence." As the *Mooney* dissent explained:

> [I]t is not enough to define "gain." We then must know what "the offense" is, because the guideline does not look to "gain" simply, but to the "gain resulting from the offense." Indeed, simply to take the definition of gain without limiting it to gain "resulting from the offense" would lead to absurd results. It is not all the defendant's stock gains—over an entire lifetime of stock trading, perhaps—that count[ ], but only the stock gains "resulting from the offense."

*United States v. Mooney*, 425 F.3d 1093, 1105 n. 9 (Bright, J., dissenting). In *United States v. Jing Wang*, the court concluded that the total gain "resulting from the offense" under the Guidelines "is the gain that resulted from trading with insider knowledge" and "the sentencing guideline range cannot move up or down based upon movement in market price of the stock unrelated to the deception forming the offense conduct." No. 13CR3487 WQH, 2015 WL 1955045, at *8 (S.D. Cal. Apr. 29, 2015). Moreover, in *United States v. Joseph*, 705 F. App'x 711, 718 (10th Cir. 2017), the court applied a causation analysis to determine the defendant's gain under 2B1.1. The court ultimately concluded that the defendant "could foresee that his acts could harm others and that his acts indeed caused such harm." *Id*.

Accordingly, whether the Court apply a gain or loss calculation, the government must prove what Griffin received in financial aid from BHS as a *result of the fraud*. The government simply cannot make this "showing" and the Court should reduce the BHS figure to $0 both for restitution and the Guidelines calculation.

## C. ACCEPTANCE OF RESPONSIBILITY

The defendant Griffin qualifies for, and should be given, two levels for acceptance of responsibility as to both the "Belmont Hill School" counts (7-10) and the "Tax" counts (11-21).

By his guilty plea as to both the Belmont Hill School counts and the Tax counts, the defendant clearly demonstrated acceptance of responsibility for these particular offenses. *See* USSG §3E1.1(a). Moreover, the government was notified of the intended plea nearly a week before trial – and the Court as well. Although one could argue that the notice date was close to the trial date (and the actual plea took place on the trial date), in reality, both the government and the Court benefited greatly from the plea, in final case preparation, courtroom presentation and control, as well as in the length of the trial. Although the defendant is not asserting that he should have the benefit of an additional point, surely the substantial, beneficial impact for all concerned as a result of the plea on those two groups of counts warrants at least two points for acceptance of responsibility. *Compare* USSG §3E1.1(a) and USSG §3E1.1(b).

Further, because the guidelines first require a calculation of the total base offense level for each group *before* applying the acceptance of responsibility adjustment, *see* §1B1.1(4)-(5), the only appropriate mechanism to apply the reduction is *within* the grouping calculation for each of the three groups.[4] That is, the reduction should be applied within the calculation for separate Belmont Hill School and Tax count groups (Counts 7-10 and Counts 11-21) – but not within the "TPS" group (Counts 1-6). *See United States v. Wattree*, 431 F.3d 618, 622 (8th Cir. 2005); *United States v. Williams*, 344 F.3d 365 (3d Cir. 2003); *United States v. Garrasteguy*, 559 F.3d 34, 38-39 (1st Cir. 2009); *United States v. Muldoon*, 931 F.2d 282 (4th Cir. 1991).

### D. OTHER GUIDELINE ISSUES

---

[4] As referenced below, the TPS counts, the Belmont Hill School counts, and the Tax counts should be grouped into three separate groups rather than two.

### 1. Loss as to the TPS fraud

The defendant objected to the government's proposed loss figure for the overtime fraud which increased its trial presentation by adding another $7,505.52 allegedly attributable to Lt. Lawrence Kiely – but without the testimonial attestation as to its underlying authenticity by the government witness – Tanya Chavez. *See* Presentence Report at 37 (objection to ¶ 106). The defendant maintains this objection for the reasons stated therein and incorporated herein.

### 2. Role

The defendant objected to Probation's determination that he should be given a four-point role enhancement. The defendant incorporates by reference the more detailed objection it made, as set forth now in the Presentence Report. *See* Presentence Report at 36 (objection to ¶ 39).

### 3. Restitution

The defendant objected to Probation's determination as to restitution. *See* Presentence Report at 37 (objection to ¶ 106). Probation responded by stating that "the Probation Office agrees that the restitution calculation shall be determined by the Court as to Belmont Hill." *Id.* The defendant incorporates by reference the more detailed objection it made, as set forth now in the Presentence Report at 37.

## III.  DEPARTURES AND VARIANCES

### A. THE NATURE OF THE DEFENDANT'S OFFENSES

Congress has stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense. *See* 28 U.S.C. § 994(j). Courts have also found that prison time for first offenders is not appropriate if the crime charged is neither violent nor "serious." *United States v. Polito*, 215 Fed. Appx. 354, 2007 WL 313463 (5th Cir. Jan. 31, 2007)

(unpub.) (where defendant convicted of possession of child pornography and guidelines 27-33 months, district court's sentence of probation with one year house arrest reasonable in part because first offense). That position has been supported by a 2014 bi-partisan Congressional Task Force (the Colson Task Force, which, in 2014, recommended incarceration only for the most serious of crimes.

http://www.urban.org/events/transforming-prisons-restoring-lives-final-recommendations-charles -colson-task-force-federal-corrections

At the least, short sentences in white collar cases are adequate for both the retribution and deterrence policies underlying general sentence theory. *United States v. Adelson*, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (citing research); United States Sentencing Commission Fifteen Years of Guidelines Sentencing at 56 (2004). Prison time of any duration is simply more significant for first offenders, particularly white-collar offenders. *See United States v. Paul*, No. 06-30506, 2007 WL 2384234 (9th Cir. Aug. 17, 2007) (unpub.) (per curiam). In that vein, the ruin of a valued reputation and the stigma of a felony conviction are significant punishment. *See United States v. Smith*, 683 F.2d 1236, 1240 n.13 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive.").

Correspondingly, too long a sentence may well impair rehabilitation. That statement needs no citation; it is simply common sense. Courts have held the same. *See  e.g., United States v. Autery*, 555 F.3d 864 (9th Cir. 2009); *United States v. Pallowi*ck, 364 F.Supp.2d 923 (E.D.Wisc. 2005). Further, from a public safety view, older offenders are unlikely to reoffend and little danger to the public. *See Recidivism and the "First Offender:"A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, at 13-14 (May 2004), *available at*

http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_First_Off ender.pdf.

From a societal point of view, sentences that are too long for the offense unnecessarily destroy families. "Long sentences are also immensely hard on prisoners and cruel to their families, as it's usually very difficult for a prisoner to re-integrate into his family and community after very long prison sentences." *Criminal Law* 2.0, 44 Geo. L.J. Ann. Rev. Crim. Proc. (2015) at page xii-xiii.

**The Nature of the Defendant Himself**

The Court may weigh the good in the defendant's life as well as the bad. *See United States v. Santoya*, 493 F.Supp.2d 1075 (E.D. Wisc. 2007) (the defendant "had significant positives in his character and background, as evidenced by the [letters of support] which the guidelines did not take into account" and the judge "is permitted to consider the entirety of the defendant's background and character, not just the negatives …"); *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y 2006) ("But surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

The prosecution would have the Court see the defendant through a glass darkly. To quote Shakespeare: "The evil that men do lives after them; the good is oft interred with their bones." The prosecution wants to simply bury Daniel Griffin. That is wrong as a matter of law; it is wrong as a matter of morality. For every act contained within these three categories of offenses, the defendant has done a hundred good ones, both seen and unseen.

<u>**Personal Deeds**</u>

Among the most salient of the defendant's qualities has been his willingness to help others:

**Helping Others**

- "Dan puts other people's needs before his own and assists in any manner possible."
  *Paul F. Coleman (former MSP) (Ex. 3-3)*

- "In my experience with Dan, I have consistently witnessed kindness, compassion, and integrity of a good father, husband, and friend. During the challenging period when my father battled cancer, Dan had become friends with my dad and demonstrated exceptional empathy and support by visiting him weekly.  His presence provided comfort and peace to my father during this difficult time." "He always had the willingness to help others."
  *Donald P. Doherty (decorated U.S. Army veteran and police officer) (Ex. 3-4)*

- "Dan is … the first person to jump in and help someone whether it be a family member or a friend.  When my father passed away years ago, he became a rock for my mother and he makes time to help her every time she calls."
  *Donna A. Griffin, wife (Ex. 3-9)*

- "Dan is always willing to drop whatever he is doing to lend a hand or help a neighbor."
  *Jeff Tarpy (Ex. 3-19)*

- "When my dad died (he was a State Police officer for over 40 years), Dan was the first to reach out to make sure my dad's sendoff was special."
  *Marianne Travia (Ex. 3-21)*

- "Daniel is a kind, generous, and hardworking person. He always reaches out a helping hand to his friends and neighbors.  Over the past years, until his passing, he [Dan] regularly visited an elderly neighbor to check on him and provide companionship.  Just recently, on Thanksgiving Day, he brought a dinner to a neighbor who was alone for the holiday. [He]… is a man of integrity with a big heart and I love and respect him for those qualities."
  *Anne M. Wroblewski (Ex. 3-22)*

**Family**

- "Dan is a devoted family man." He and his wife's "sacrifices, dedication, and devotion resulted in them raising three hardworking and successful children."
  *Paul F. Coleman (former MSP) (Ex. 3-3)*

- "Dan has always been a positive presence in his children's lives." "His children are all conscientious, kind and well respected within our community." "He is still needed by his family."
  *Christopher J. Donahue (Ex. 3-5)*

- "Dan and his father were inseparable.  Dan had the extreme misfortune of witnessing his father's death as his father died of a heart attack on or about 1981 while a passenger in Dan's vehicle.  To this date, Dan rarely discusses this incident.  However, I know it affected him deeply." "Later, Dan's mother became afflicted with Alzheimer's Disease.  Dan provided his mother with primary care and support until her death." "He financed his own way through college.  I have always known Dan to be extremely hardworking. He always had a part time job while we attended high school and college.  He comes from modest means."
  *Ronald J. Mone, Esq. (Ex. 3-14)*

- "My father's passing left Dan to assume the "man of the house" role.  My brother [Dan] was a huge sense of support for all of us, especially my mother.  He also assisted my grandmother who lived in Belmont, Massachusetts.  He took responsibility for not only our family but many extended family members." "Both my husband and I are cancer survivors…  My husband was diagnosed again with cancer in early 2021 and has ongoing life-threatening issues." "A few years ago, my adult son [Will] was diagnosed with a mental health diagnosis, rendering him disabled. … As part of my son's illness, he sporadically leaves home without prescribed medications, clothing and essentials of everyday life.  My first call is to Dan …  I have asked Dan to become Will's legal guardian."
  *Cynthia Papageorge, sister of Daniel Griffin (Ex. 3-15)*

- "One of Dan's most commendable qualities is his commitment to his children.  I have witnessed firsthand the love and care he provides for his family.  He consistently prioritizes their well-being, ensuring that they have a stable and nurturing environment.  His involvement in their lives is not only evident in the time he spends with them but also in the values he instills in them. As a single mother facing various challenges, I have often turned to Dan for assistance, and he has never hesitated to offer his help."
  *Kelly Pesanelli (Ex. 3-16)*

## Letter of Jon Biotti, Chairman of the Board of Trustees, Belmont Hill School

"I am writing to you about the case involving Dan Griffin. I have known Dan Griffin and the entire Griffin family for more than 15 years. I have known Dan and his entire family in many different ways, which has allowed me to observe Dan, his family and his children over a long period of time and in many different settings. I know Dan Griffin as:

1) A personal friend
2) Our families are friends
3) As a coach to where I coached one of his children in ice hockey
4) As a parent where Dan coached one of my children in baseball
5) As parents in the Belmont Hill School community

I have also been the Board Chair of the Belmont Hill School for the past fourteen years and was actively involved in getting the two Griffin sons to attend our school and become a part

of our community. Throughout all of these vectors, I have had the chance to see Dan in many different settings including many where Dan showed great parenting skills; true patience; and thoughtfulness to his community. I have only known Dan to act with kindness, maturity, honesty and grace in all situations.

I am aware of Dan's legal predicament as he has described them to me in detail. And I have seen firsthand the impact that this has had on Dan and his family. As you consider the sentencing involving Dan Griffin, I thought it appropriate to share with you the following examples of Dan's good character:

1) Over the past fifteen years, I have witnessed many thoughtful acts of kindness, devotion to family and focus on community by Dan Griffin. He is a respected member of his different communities.
2) He has volunteered his time to coach town baseball and has always been committed to assisting every single member of the team.
3) Dan was always a model parent when I was coaching his son in hockey even when his son was not starting or getting the most minutes in games.
4) Dan was always willing to get different boys to games when their carpools fell apart, even when it took him far out of his way.
5) Dan always volunteered time for Belmont Hill school events whether it was parent chaperoning or for the Better Buy Sale where we make sure that clothing gets handed down to the less fortunate members of our community.
6) I have witnessed Dan take a youth hockey player to the hospital when an injury occurred during the game and Dan was the first to volunteer.
7) I have seen Dan and his family make sure that a boy from an at-risk family was supported at Belmont Hill when that boy's family life became unstable; and
8) I also know through my role as Board Chair with Belmont Hill that Dan Griffin pointed out a clerical error at one point that would have resulted in a higher financial aid package being granted to the Griffin family. And in this circumstance, the school would not have known about the mistake unless Dan brought it up. In this case, he showed strong character.

I wanted to share with you these examples as a means of showing Your Honor that this letter is an easy letter for me to write given my high conviction that Dan Griffin is a good person."
*Jon Biotti (Board Chair, Belmont Hill School) (Ex. 3-1)*

Absent the convictions before the Court, the defendant has also been an excellent parent.

More than that, he has been the lifeline for his *sister's mentally ill son*, chasing him across the

country whenever necessary, which has been all too often. With a cancer-stricken husband, his

sister has had to turn to him for help at her son's every turn, as she clearly states in her letter. *See*

*Letter of Cynthia Papageorge*, sister of Daniel Griffin. *See* Ex. 3-15. Incarceration will remove

that sole support for the duration of the incarceration. *See United States v. Antonakopoulos* 399

F.3d 68, 81 (1st Cir. 2005); *United States v. Roselli*, 366 F.3d 58, 67-70 (1st Cir. 2004).

### Massachusetts State Police Accomplishments

The government also wishes to put on blinkers when it comes to the good deeds the

defendant did in his 34-year career as a state police officer. These letters give lie to that tactic.

- "[Daniel Griffin was a] …highly respected, hardworking trooper who committed over 30 years of his life to the state police.  During his career, he was assigned to several high-profile units due to his impeccable record on the job."
  *Paul F. Coleman (former MSP) (Ex. 3-3)*

- "… I worked with Lt. Daniel Griffin from 2012-2019. Dan was a valuable team member to OGR and his reporting of grant activity was timely, informational, and concise. I experienced him as having integrity and respect for his position as well as for his fellow troopers. As the MSP Liaison, he worked effectively with me regarding grant guidelines and was instrumental in developing programs for Massachusetts and with neighboring states that sought to improve traffic and highway safety. Dan was passionate about his work and proved himself knowledgeable and helpful at conferences and meetings when discussing the role of MSP in this subject matter."
  *Deborah Firlit (Retired Grant Manager in the Office of Grants and Research Division (OGR) of the Executive Office of Public Safety and Security) (Ex. 3-7)*

  "What I witnessed … was a man who was extremely dedicated to his family and the job he loved, being a Massachusetts State Trooper." "Serving the Commonwealth of Massachusetts as a Trooper was … something Dan loved.  It was not easy on him or his family, but he did it and he protected and served the citizens of Massachusetts for over thirty years." "Over the years Dan has had at least three work related injuries and surgeries on his knees that I can remember, and was in significant pain with long periods of rehabilitation and always returned to the job."
  *Douglas M. Fici (Ex. 3-6)*

  "Mr. Griffin and I worked together on several regional enforcement and research projects together.  I found Mr. Griffin to be honest, sincere, and hardworking to improve public safety in the State of Massachusetts and was dedicated to his service for decades."
  *John Flanigan, retired Commander of the Vermont State Police Traffic Unit (Ex. 3-8)*

  "[M]y dad … was a state police officer for almost 40 years before his retirement in 1984. .. I think becoming friends with Dan was easy.  He was so much like my dad and I respected and looked up to Dan for devoting his life to law enforcement.  It is quite a sacrifice …"

*Susan T. Martignetti (Ex. 3-10)*

"…I worked with the National Highway Traffic Administration (NHTSA) as a contractor for about 17 years. During that timeframe I worked with Lieutenant Griffin on a number of traffic safety projects as well as various national highway safety initiatives.  I was always impressed with Dan's leadership, his ability to coordinate operations and motivate subordinate officers effectively and efficiently.  Over the course of those many years, I got to know Dan, on a professional level, as a hard-working police supervisor…"
*Edmond Minall, 24-year veteran of the New York City Police Department (Ex. 3-13)*

"I know that after family, his law enforcement career was the next most important thing in his life."
*David Quick, Retired Captain, Rockingham Police Department, North Carolina (Ex. 3-17)*

"I so admire Dan for essentially risking his life while a member of the Bomb Squad each and every day.  It can be very scary especially for anyone with a young family, but Dan was dedicated to his job and his service to the safety of the public."
*Joseph Travia (Ex. 3-20)*

The defendant did not get to be a lieutenant-in-charge because his career was one of incompetency – but because he was a very competent and very effective state trooper, within and without the State Police culture:

- He suffered three job-related knee injuries in the line of duty.

- He was awarded the Medal of Merit for his work at Logan Airport post-9/11 with his K-9.

- He created checkpoint operational plans to survive court challenges for all the Massachusetts State Police checkpoint programs in coordination with legal counsel.

- He read to children at Patriot Place and enlisted a local knitting club to provide stuffed animals to keep in their cruisers to give to children in traumatic situations.

- The Traffic Program Section until won first place in the International Police Association of Chiefs of Police Law Enforcement Challenge through its program to increase highway safety and reduce crashes and fatalities (2012).

- In 2017 he was awarded the Mothers Against Drunk Driving (MADD) Hero award for his efforts in reducing impaired driving.

**B: SIMILARLY SITUATED DEFENDANTS**

**Facts**

As fully detailed in Exhibit 1, the United States Attorney's Office for the District of Massachusetts has recently brought at least three sets of overtime cases alleging fraud by employees of law enforcement agencies. First, it prosecuted eight (8) troopers involving Troop E of the Massachusetts Turnpike for overtime fraud. One of the eight troopers was a lieutenant. *Prior* to that, it prosecuted one Quincy police officer who was a lieutenant for overtime fraud. *After that*, it prosecuted a group of Boston Police officers for overtime fraud. (It also prosecuted one Boston Police Department employee for overtime fraud.)

The Commonwealth of Massachusetts has also brought similar cases. It charged three Troop E lieutenants with overtime fraud; one already being prosecuted by the USAO and two prosecuted only by the Commonwealth. It has also prosecuted a Massachusetts State Police payroll director for fraud (larceny).

All eight (8) of the federal Troop E prosecutions for overtime fraud have been completed and the troopers sentenced. The federal prosecution of the Quincy lieutenant for overtime fraud is complete. The federal prosecution of the Boston Police officers is nearly complete in the sense that the trial of four officers resulted in not guilty verdicts; all but one of the other co-defendants were to be sentenced this month and next (March and April 2024); one defendant is currently on trial – delaying the sentencing of the cooperating co-defendants.

Federal prosecution of a Boston Police Department employee is also complete.

The Commonwealth of Massachusetts' prosecution of the three (3) Troop E lieutenants is complete and the lieutenants each sentenced. Its prosecution of the Massachusetts State Police payroll director is complete.

*No sentence for any one of these defendants* prosecuted by this United States Attorney's Office or by the Commonwealth *remotely approaches the sentence sought for Daniel Griffin* – despite similar charges, despite similar conduct, and despite similar records. *See* Exhibit 1 (detailing the cases and sentences). The longest sentence to date is the sentence of the Quincy police lieutenant after trial – a year and a day. None of the Troop E lieutenants received a day in jail other than their day of arrest – from either federal or state judges. Five of the other seven Troop E officers received probation in effect. Only two of the Troop E line officers received sentences involving incarceration (two months for one and three months for the other) – both by Gorton, J. The Boston Police employee received three months from Gorton, J. The Massachusetts State Police payroll director received probation from a Framingham-based, state court judge (Fabri, J.).

The sentence sought for Dan Griffin is at least ***twenty-five times more than the sentence received*** by all but one of these other defendants. It is ***five times more than that one sentence received*** by the single law enforcement person prosecuted for overtime or related fraud who went to trial – Quincy Police Lt. Corliss. All this despite the fact that Griffin's *charges* are essentially similar, the *conduct* is essentially similar, and the *criminal records* are definitely similar. Sentencing memos filed both sides in the Troop E federal and state prosecutions mirror the testimony heard during the Griffin trial –and then some.

What accounts for the difference?

- **Charging decision: conspiracy**. No other defendant was charged with conspiracy so as to increase the loss figure by some multiple. Certainly, virtually any one of the Troop E superior and line officers could have been so charged. The undersigned was not counsel at the time of the indictment and so cannot speak as to whether there were any plea discussions prior to indictment, but there certainly was no option to eliminate the conspiracy aspect, as a charge or for sentencing aspect, after undersigned counsel file an appearance.

- **Charging decision: Period of time alleged in the indictment regarding the misconduct.** The charged time period for the fraud determines the loss calculation. The period of time for the overtime fraud charged in the Quincy police officer case was 7 months. The period of time charged in virtually all the Troop E cases was a year or occasionally two. Here, the time period was three years – the most of any case. Therefore, the three-year conspiracy was multiplied by at least five (5) participants to generate a loss figure more than five times any other defendant.

- **Role.** None of the four (4) lieutenants charged to date suffered a role enhancement of any kind let alone four (4) levels. The government chose that strategy.

- **Other factors.** The defendant here (Griffin) also pleaded to tax charges and what is in essence, financial aid fraud. Those charges, however, under the guidelines, account for just four levels of enhancement. The focus, as the government intended, remains upon the overtime charges.

**Law**

Title 18 U.S.C. § 3553(a)(6) directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The First Circuit has suggested that the provision is "generally" aimed at the minimization of sentencing disparities among defendants nationwide but permits disparities among co-defendants for a variety of reasons. *United States v. Ortiz-Islas*, 829 F.3d 19, 28 (1st Cir. 2016). *See also United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) (affirming sentence where district court judge sought to avoid an unwanted disparity with a co-defendant and imposed 144 months rather than the guideline range of 262-237 months).

A central goal of the guidelines is to provide and promote a sense of fairness in the guideline's application. Extremely divergent sentences undermine respect for the law. *United States v. Lazenby*, 439 F.3d 928, 934 (8th Cir. 2006); *Cullen v. United States*, 194 F.3d 401, 408 (2d Cir. 1999); *United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999); *United Sates v. Ray*, 920 F.2d 562 (9th Cir. 1990), amended, 930 F.2d 1368, 1372-73 (9th Cir. 1991) ("disparity was said to be one of the most important evil the guidelines were intended to cure"). *United States v.*

*Galvez-Barrios*, 355 F. Supp. 2d 958 (E.D. Wis. 2005) (in illegal reentry case, where Guideline

range was 41-51 months, court imposed 24 months in part because of unwanted disparity in

sentences among similarly charged defendants in border areas); *United States v. Huerta-*

*Rodriguez*, 355 F.Supp.2d 1019, 1030-31 (D. Neb. 2005) (sentence decreased from 57-70

months to 36 months in part because in other districts a similar defendant would not be

prosecuted for illegal reentry, but "would be simply deported"). The Court may vary downward

when the government seeks to imprison a defendant "five times as long as the [codefendant] who

hired, inspired, and gravely misled [him]." *United States v. Maccaul*, 2002 WL 31426006

(S.D.N.Y. October 28, 2002) (unpublished); *see also United States v. Noriega*, 40 F. Supp. 2d

1378 (S.D. Fla. 1999).

**Argument**

The grounds for this request for a variance sits in between the disparity between similarly

situated co-defendants and the disparity between similar-conduct/similar-record cases nationally.

Its focus is upon defendants with reasonably similar charges, conduct, and records – all

prosecuted by the same office within the same district. This Court has authority to recognize and

consider these similarities to support the proposition that similar conduct should be punished in a

somewhat similar manner in determining whether to vary downward. *United States v. Rodriguez*,

527 F.3d 221, 225 (1st Cir. 2008).

The issue also best combines similarly situated, charged defendants with similarly

situated *uncharged* potential defendants – to be viewed in proper context. The Troop E

investigation charged only some ten troopers of varying ranks between federal and state

prosecutions. *See* Exhibit 1. Media accounts, based upon information released by the

Massachusetts State Police, indicate that at least 46 troopers were investigated and disciplined in

various fashion – some keeping their positions upon repayment of their fraudulent overtime

gains, many being forced to leave. But whatever their punishment, it was not prosecution, let

alone incarceration. The true number exceeds that now by some unknown factor. *See*

<https://www.wbur.org/news/2020/07/10/state-police-overtime-scandal-discipline>

     Moreover, at the trial of this matter, there was testimony from each of the cooperating

witnesses that the overtime practices underlying the defendant's TPS fraud conviction were

prevalent throughout the Massachusetts State Police with its 2000 members – not just Troop E

and not just TPS.[5] None of these cooperators are to be prosecuted – as we know firsthand. And

one of them, Kiely, was the very teacher of the defendant, mentoring him concerning all the

prosecuted practices. Traffic Program Section Officers-in-Charge preceding the defendant,

Wicks and Walsh, remain unscathed. As do all the other troopers long gone from the state police,

at every rank when they were there.

     It defies any sense of justice to permit guideline and prosecutorial manipulation to permit

a crushing sentence in this context.[6]

### C. THE DEFENDANT'S HEALTH AND POTENTIAL MEDICAL NEEDS

     The Court may, in fact, *must* take into account the defendant's medical issues in

fashioning an appropriate sentence. The sentence imposed must ensure that "needed …medical

care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Commission

recognizes that "[p]hysical conditions…may be relevant in determining whether a departure [or

variance] is warranted," and has always recognized that "in the case of a seriously infirm

---

[5] (1) *Jakobowski*: Day 2, 202:15-18; (2) *Kelley*: Day 5, 159: 16-22; 160-161:25-4; (3) *Kiely*: Day 6, 110: 17-25; 111:11-25; 117:13-24; (4) *Weldon*: Day 10, 64:11-21.  Even the Superintendent herself had to acknowledge that nearly everyone working at Massachusetts State Police Headquarters left at least one-half hour early every single day – at 3:00 p.m. – five days a week. (*Gilpin*: Day 9, 185:24-187:1).

[6] In this sense, the role enhancement should become subject to a downward variance.

defendant, home detention may be as efficient, and less costly, than imprisonment." USSG §
5H1.4, p.s. *See United States v. Martin*, 363 F.3d 25, 49-50 (1st Cir. 2004) (departure for serious
medical condition); *United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) (departure for
serious medical condition); *United States v. Lacy*, 99 F. Supp2d 108 (D. Mass. 2000) (departure
for serious medical condition); *United States v. Baron*, 914 F. Supp. 660, 662-665 (D. Mass
1995) (departure for serious medical condition). Home detention is particularly appropriate
where a first offender is in poor health. *United States v. Coughlin*, CRIM. 06-20005, 2008, WL
313099 (W.D. Ark. Feb. 1, 2008) ("A court that mechanically doles out precalculated sentences
on a wholesale basis to categories of faceless defendants fails to do justice…")

**The defendant has substantial medical needs.** Griffin has suffered from a number of
medical issues which are detailed without objection in the Presentence Report, thereby obviating
the need for the defendant to file with the court voluminous medical records. Recently, the
defendant filed a motion for a postponement of his sentencing because of the need for the second
of two surgeries on his right leg to remove a "spacer" and insert a new artificial knee. The spacer
simply cannot remain in place for the length of time the Presentence Report reports as the
guideline range for sentencing purposes. Three separate letters by his physician have been filed
which support his current circumstances. After the surgery, he and his leg need to recover
properly.

**Even after surgery, the defendant's medical needs may pose substantial risks.** When
his leg and body have recovered properly, he will *still* be at risk for infection. *See* ECF Nos. 82,
83, and 96. The Bureau of Prisons is the last place, despite whatever it may claim, for the
defendant to be should infection re-occur as it has once already. Any sentence to incarceration

may well be a risk to his health. It may be a risk to his life. Such an infection will likely be difficult to treat in prison.

An audit by the Office of the Inspector General found systemic deficiencies in the Bureau of Prisons' delivery of health services. It found that at a number of institutions, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious condition." *See* U.S. DEP'T OF JUSTICE, Office of the Inspector General Audit Division, The Federal Bureau of Prison's Efforts to Manage Inmate Health Care Costs ii-xix, 32-34 (2008), available at [www.justice.gov/oig/reports/BOP/a0808/final.pdf](www.justice.gov/oig/reports/BOP/a0808/final.pdf).

The defendant respectfully asks that the Court consider this factor in determining its sentence. *See* U.S. JUSTICE DEPT. REPORT, The Impact of An Aging Prisoner Population on the Bureau of Prisons, (May 2015), available at [https://oig.justice.gov/reports/2015/e1505.pdf](https://oig.justice.gov/reports/2015/e1505.pdf)

### D. THE DEFENDANT'S STATUS AS A FORMER LAW ENFORCEMENT OFFICER

His leg condition, even without further infection, alone or together with his age, will make him more vulnerable in prison. The defendant's status as a former law enforcement officer, in combination with his leg, will make him *even more* vulnerable to abuse or victimization in prison. That status, together with medical and physical condition and his age, will likely make him a "sitting duck" in prison, vulnerable to potential physical abuse or even rape. *See United States v. Koon,* 833 F. Supp. 769, 788 (C.D. Cal. 1993) (finding of unusual vulnerability when defendant was former law enforcement), *aff'd Koon v. United States*, 518 U.S. 81, 113 (1996); *United States v. LaVallee*, 439 F.3d 670 (10th Cir. 2006); *United States v. Gonzalez*, 945 F. 2d 525, 526 (2d Cir. 1991); *United States v. Lara*, 905 F.2d 599 (2d Cir. 1990); *United States v.*

*Ribot*, 97 F. Supp.2d 74, 84 and n. 5 (D. Mass. 1999) (Gertner, J.) (exploring how extraordinary vulnerability to abuse in prison may serve as a basis for downward departure from guideline sentence). The National Prison Rape Elimination Commission (June 24, 2009), Executive Summary: http://nprec.us/publication/report/executive_summary.php; see Jeannie Suk, *Redistributing Rape*, 48 American Criminal Law Review at 111 (Winter 2011).

### E. COLLATERAL PERSONAL CONSEQUENCES

Defendants, particularly white-collar defendants, suffer collateral consequences, often perhaps to them as severe as incarceration itself: loss of reputation, stigma in their community – both professional and person, and impaired mental health. They may even suffer, along with their family, harsh financial penalties. *See United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (the defendant already suffered substantially from the criminal investigation itself); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (loss of teaching certificate and pension); *United States v. Mateo*, 299 F.Supp.2d 201, 209-210 (S.D.N.Y. 2004) (loss of family life, socioeconomic status, future employment opportunities, certain civil rights).

The defendant here has suffered through a lengthy investigation; he is permanently stigmatized in his professional and personal community; his wife is stigmatized; his children will live with these convictions for the rest of their lives – far beyond the end of his; he has limited if any future employment opportunities; the past five years have already taken a severe toll on his mental health – for which he has sought help.  *See* Presentence Report at ¶ 82.

### F. SEVERE COLLATERIAL FINANCIAL CONSEQUENCES

The financial penalty to the defendant as a consequence of all that is before the Court is

extraordinarily harsh.

- **Restitution for the overtime fraud (TPS)**:  At a minimum, based on the evidence presented at trial, the restitution for the overtime fraud between his and his co-conspirators, is: **$135,269.75**. *See* Presentence Report at 33, 35.

- **Restitution for the financial aid fraud (BHS)**: The restitution for the financial aid fraud is to be determined.  The Presentence Report puts the figure as "TBD." *See* Presentence Report at ¶ 106.

- **Restitution, penalties and interest for the federal tax fraud**:  The restitution for the tax fraud is approximately $186,389.00. See Presentence Report at ¶ 106. The total due including penalties and interest, to be assessed after amended returns are filed, is currently estimated by professional tax counsel at: **$475,376.00.**

- **Restitution, penalties and interest likely due the Commonwealth of Massachusetts:** The total due the Commonwealth of Massachusetts after amended returns, penalties and interest is currently estimated by professional tax counsel at: **$151,391.00.**

- **Pension loss**: The defendant will lose his pension. The defendant is currently receiving $10,246.35 monthly (although the funds are being paid into an escrow account and have been beginning with the November 2023 check). That equals roughly $122,952 per year. The average life expectancy for males in the United States is 77 years; the average life expectancy for a male now 60 years old is 82 years. If the annual pension is multiplied by 22, the defendant will lose all of his future income: **$2,704,944.00.**

- **Business lost**: For the tax years set forth in the government Statement of Facts (2012-2019), the defendant's corrected corporate income from Knight Protection Services was approximately $75,000 per year on *average* – though the amount decreased in 2015-2019. The business income decreased markedly the year of the indictment, until now, when it is zero for all intents and purposes. A conservative estimate of the lost income as a result of these indictments, assuming he ran the business for only ten more years from today, would be roughly: **$750,000.00.**

**THEREFORE**, the total financial loss suffered by the defendant as a result of his

conduct will be: **$4,393,680.00** – nearly $4.5 million dollars.  He and his wife will be without

any future income. They will be just shy of destitute.

**G. THE TOTALITY OF THE CIRCUMSTANCES – ADDITIONAL FACTORS IN COMBINATION**

Again, the factors of 18 U.S.C. § 3553(a) should not be considered in isolation. As the First Circuit has recognized: "The [Supreme] Court emphasized that section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, though which runs the thread of an overarching principle." *United States v. Rodriquez*, 527 F.3d 221, 228 (1ˢᵗ Cir. 2008) (*citing Kimbrough v. United States*, 522 U.S. 85, 101-02 (2007)). Again, under that principle, district courts should impose a sentence that is "sufficient, but not greater than necessary to accomplish the goals of sentencing." *Id*. (internal quotations omitted).  Accordingly, a sentencing court should "consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing."  *Id*.

A judge may sentence as she or he deems fair and just:

> "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in the section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *United States v. Jones*, 460 F.3d 191, 195 (2nd Cir. 2006).

> "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain (citations omitted); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979, *reprinted* in 82 F.R.D. 209, (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases."). *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017)

## IV.     SUMMARY

For the above-stated reasons, either singly or in combination, the defendant respectfully requests that the Court vary downward from the advisory Guidelines.[7]  Incarceration will impact many lives: not just the defendant, but also the defendant's wife, the defendant's three children, the defendant's sister and her mentally-ill son.

Respectfully submitted,

/s/ Thomas M. Hoopes
Thomas M. Hoopes, Esq.
BBO No. 239340
Jason M. Strojny
BBO No. 707774
Libby Hoopes Brooks & Mulvey, P.C.
260 Franklin Street
Boston, MA 02110
617.338.9300
thoopes@lhbmlegal.com
jstrojny@lhbmlegal.com

DATE:        March 13, 2024

## CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies/PDFs will be sent by regular mail/email on this date to those indicated as non-registered participants.

/s/ Thomas M. Hoopes
Thomas M. Hoopes, Esq.

---

[7] A sentence that departs from these guidelines would also be consistent with the sentencing practices in this district – or put another way, it would avoid arguably unwarranted sentencing disparities.)  Sentencing Commission data for Fiscal Year 2017 shows that only 26.9% of sentences imposed in "fraud" cases in this district were within the guideline sentencing range (and none were above the guidelines).  U.S.S.C., Statistical Information Packet, Fiscal Year 2017, District of Massachusetts, 18, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/ma17.pdf.  Nationwide in tax cases, 26.5% were sentenced within the guideline range.  In the District of Massachusetts, 25% of the tax matters resulted in Probation only, 37.5% resulted in Probation and Confinement, 12.5% resulted in a split sentence, and only 25% resulted in only prison. Id. At 8.  Nationwide, 26.5% were sentenced within the guideline range. U.S.C.C., Quick Facts Tax Fraud Offenses (FY 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY17.pdf. See e.g., Exhibit 2.