UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 20-CR-10319 (MRG) |
| | ) | |
| | ) | |
| DANIEL J. GRIFFIN | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S SENTENCING MEMORANDUM

**Daniel Joseph Griffin is a criminal.**  What was true for years was finally adjudicated on December 12, 2023 in a court of law before a jury of his peers.  Griffin, the jury found, stole for years as a Lieutenant with the Massachusetts State Police (MSP).  Griffin stole overtime money while on his regular shift (*see* Tr. Exh. 221).  Griffin stole overtime money while sitting at home in his second home down the Cape (*see* Tr. Exh. 162).  And Griffin stole overtime money while he was doing work for his own security company, Knight Protection Services (KnightPro) (Tr. Exhs. 11, 263).  As the ringleader of a criminal cabal known as the MSP Traffic Programs Section (TPS),  Griffin and his uniformed confederates stole at least over a hundred thousand dollars in taxpayer-funded overtime in a few short years.[1]  For these crimes, alone, Griffin deserves a significant prison sentence.

But the jury, unlike the Court, only saw a partial picture of Griffin's criminal deeds.  As the U.S. Probation Office's Presentence Report (PSR) makes clear, Griffin was committing crime years earlier, year after year, all while taking advantage of his badge to lie, cheat, and steal.  This

---

[1] Given the conservative methodology used for loss calculation, combined with years of missing MSP records, this figure is likely significantly higher.  PSR ¶ 12, fn. 1.

sentencing memorandum will describe the totality of Griffin's criminal conduct, respond to Griffin's objections contained in the PSR,[2] and discuss the 18 U.S.C. § 3553(a) factors that support a serious prison sentence for this criminal defendant.

### I.    Griffin's Crimes

### A.    MSP Overtime Theft

Griffin may not have invented overtime theft at the State Police, but he was a quick study, who embraced its practice, mastered its execution, and fostered its cancerous growth within the ranks of the MSP. As detailed at trial, Lieutenant Griffin was the commanding officer of TPS, and as its head exercised influence over the purse strings of hundreds of thousands of federal U.S. Department of Transportation (USDOT) funds, all of which were ultimately funded with taxpayer dollars. *See* PSR ¶¶ 8-20, A. Cabral, Tr. 6 at 208.

Griffin used federal highway dollars that were dedicated to fund MSP safety initiatives such as Click-it-or-Ticket (CIOT), Distracted Driving (DD), Sustained Traffic Enforcement Program (STEP), and BAT Sobriety checkpoints (BAT) to methodically line his and his co-conspirators' pockets with tens of thousands of dollars in overtime pay for hours that Griffin and his MSP-TPS team did not work. PSR ¶ 12.

Perhaps the best illustration of Griffin's influence and greed during this scheme occurred in 2018, during the period when Griffin opted to take "injured line-of-duty" status (December 2017 to January 2019). Tr. Exh. 11. As noted at trial, even with Griffin physically absent from TPS offices in 2018, Griffin still exercised authority over TPS during this period, including overseeing

---

[2] To the extent that Griffin's sentencing memo (ECF Dkt. No. 206, "Sen. Memo") raises new challenges to the PSR (e.g., arguing that a higher quantum of proof is required to prove loss), the government respectfully reserves the right to respond more fully in separate argument or briefing.

overtime grant applications (*see* Kelley, Tr. 5 at 113-115).  For fiscal year 2018, however, Griffin did not apply for any grant funding for Distracted Driving overtime even though tens of thousands of USDOT dollars were available for MSP.[3]  *See* Tr. Exhs. 243-246.  In other words, when it came to DD overtime, if Griffin wasn't getting paid, no one was getting paid.  The Commonwealth was worse off for Griffin's greed.

Griffin has attempted to minimize his role in the offense with Objections 1 through 8, and 10 (PSR at 31-32), but his own words and actions refute his efforts to continue to avoid responsibility for his crimes.  In a September 12, 2011 email, Griffin, himself, edited a TPS Organizational Structure abstract that declared all of his management, oversight and responsibilities as TPS's commanding officer (*see* Tr. Exh. 61):



Far from the shrinking violet that the defendant seeks to portray himself as to the Court, the evidence at trial showed that Griffin played an integral in the MSP-EOPSS grant process and the allocation of overtime to Troopers throughout the State Police.  Griffin edited the MSP Division

---

[3] NHTSA records showed that USDOT funding for BAT overtime in 2018 was similar to 2017.  *See* Tr. Exhs. 245-246.

Commander's Order that governed the protocols for federally funded traffic enforcement overtime (*see* Tr. Exh. 33); Griffin would announce, "Christmas in March," as if he were Santa Claus bestowing the gift of federal overtime funds to other Troops receiving these coveted assignments (*see* Tr. Exh. 45); and Griffin decided what Troops received federal overtime funds and where to conduct enforcement (*see* Tr. Exhs. 128, 129). As Trooper Weldon testified at trial, not only would Griffin schedule BAT sobriety checkpoints down by the Cape to be near his second home during the summer months, even when Griffin was out injured, Griffin could cancel, and did in fact, cancel an overtime saturation patrol when he found out that the assignment went to an MSP "lieutenant that didn't typically work with us[.]" T. Weldon, Tr. 10 at 99.

Griffin dictated the where, the when, but also the who, as in, who got chosen to be part of TPS's gang of thieves. In the PSR, Griffin's claim that Troopers picked for TPS were based on "quality control" is unserious. PSR at 32. Perhaps Griffin was inattentive when "quality control" exhibit A, MSP Lieutenant Lawrence Kiely, testified over the course of two trial days (December 1 and 4, 2023). Griffin handpicked Kiely to be a part of TPS overtime enforcement assignments for 2015, 2016, and 2017 after Lt. Kiely had left TPS for a unit wholly unaffiliated with traffic enforcement (MSP's Employee Assistance Unit), Kelley, Tr. 5 at 100; Kiely, Tr. 6 at 25.

If Griffin had been paying attention at trial, he would have learned that, while working TPS overtime shifts as Griffin's handpicked team member, Lt. Kiely overlapped TPS overtime shifts with his regular shift (Kiely, Tr. 6 at 81); Kiely submitted recycled citations from prior paid highway details (Kiely, Tr. 6, at 80); and Kiely would leave the overtime shift hours earlier than required to collect the full overtime, including during BAT sobriety overtimes where Griffin was the commanding officer, all while fraudulently collecting thousands of dollars in federal overtime pay for hours not worked (Kiely, Tr. 6 at 82, 92, Tr. Exh 220).

4

But Griffin, of course, knew who he was getting when he selected Lt. Kiely to join TPS overtime shifts in 2015, 2016, and 2017. It would be the same Kiely who worked together with Griffin in TPS dating back to 2008 when they were wrongfully leaving overtime shifts early and committing crime as co-conspirators. Kiely, Tr. 6 at 117. And it would be the same Kiely who was going to go along with the program, i.e., stealing, of which Griffin was now in charge at TPS. This was Griffin's hiring criteria for TPS, and this was borne out by Griffin's welcoming Troopers like Kelley and Weldon into the criminal fold of Traffic Programs.

Because the Court, having sat through the entirety of a trial, is well-familiar of the extent of Griffin's MSP overtime crimes, it is unnecessary to repeat in this memorandum the extent of Griffin's criminal conduct already covered by the trial and the PSR. Suffice it to say that the trial testimony and exhibits proved beyond a reasonable doubt that Griffin led a years' long criminal conspiracy that betrayed his badge, brought shame to the MSP, and cheated the citizens of the Commonwealth out of the honest services of their public servants.

**B. Tax Fraud**

Griffin, however, did not limit his abuse of his badge to MSP overtime fraud. As revealed by interviews of Griffin's tax preparer (Tax Preparer), Griffin's year-after-year tax fraud was aided and abetted by the fact that Griffin was a police officer. *See* Tax Preparer 302, dated Nov. 30, 2020 ([The Tax Preparer] did not question GRIFFIN's integrity (because he was a cop)).

To illustrate, dating back to at least as early as 2012, GRIFFIN would send the Tax Preparer KnightPro's books and records (profit and loss, balance sheet, general ledger, etc.) so that the Tax Preparer could ascertain and calculate KnightPro's revenue and taxable income. Year after year, the KnightPro books and records would show dozens of payments to dozens of different employees/contractors, as well as expenses for travel, insurance, equipment, utilities, and even

janitorial expenses.  Yet, despite the time and resources that Griffin dedicated to KnightPro from 2014 to 2019, with the exception of one year, Griffin presented KnightPro to the Tax Preparer as a yearly, money-losing operation.  PSR ¶ 24.  In other words, Griffin presented KnightPro to the Tax Preparer as a very expensive, time-consuming, and money losing hobby, which Griffin chose to maintain year after year despite mounting losses.

To a trained tax professional, not to mention the Internal Revenue Service (IRS), KnightPro's reported income hardly seemed believable.  But because of Griffin's badge, along with his MSP income, the Tax Preparer gave Griffin the benefit of the doubt that Griffin was somehow working full-time as a cop, while spending tremendous amounts of time and resources running a failing company.  *See* Tax Preparer 302, dated Nov. 30, 2020.

We now know none of this was true.  This was because Griffin lied to the Tax Preparer and lied to the IRS year after year, dating back to at least 2012.  Over the course of 2012 to 2019, Griffin concealed over $727,000 in KnightPro income from the Tax Preparer and the IRS.  PSR ¶ 23.

Griffin's lies, however, took multiple forms.  For example, the most common and effective lies were Griffin's understatement of thousands of dollars income, which Griffin accomplished by shaving off income amounts from hundreds of checks payable to KnightPro.  *See* Exhibit A, attached.  Another method that Griffin used to deceive the Tax Preparer and the IRS was to overstate KnightPro expenses.  Sometimes it came in the form of Griffin claiming a monthly $150 janitorial expense for KnightPro, which was really a monthly payment to Griffin's household cleaning lady. Sometimes it came in the form of Griffin buying and writing off a season package of Red Sox tickets, which Griffin used a portion of tickets for personal use or re-sold, and, therefore, recouping the costs.  Or sometimes it came in the form of Griffin using the KnightPro

credit card during taxpayer-funded MSP overtime boondoggles (e.g. Denver, Colorado August 2016; Baltimore, Maryland, August 2017), and claiming such charges as tax deductible KnightPro expenses.  PSR ¶ 17.

In the end, no tax lie was too big or too small for Griffin, which resulted in Griffin illegally netting nearly three-quarters of a million dollars, tax-free from the IRS during an eight-year stint. With hundreds of thousands of dollars in tax-free money, Griffin reaped his criminal rewards by diverting KnightPro funds through his personal account (and sometimes thereafter through a 529 investment account) to pay for his Cape House expenses, his Ocean Edge Golf Club membership, and his children's private school and college tuitions.  PSR ¶ 25.

### C.  The Belmont Hill School Fraud

When Griffin wasn't occupied with lying to the State Police or the IRS, Griffin was lying to the Belmont Hill School in order to fraudulently obtain financial aid for his children.  From 2013 and continuing to 2020, Griffin lied year after year to administrators at the Belmont Hill School about his financial income and assets in order to obtain over $170,000 in financial aid.  *See* PSR ¶ 28.

Moreover, similar to his overtime fraud and tax fraud, Griffin took advantage of his official position in dealing with Belmont Hill School officials by **regularly using his State Police email and MSP Lieutenant signature block for correspondence with Belmont Hill**.  In one example, Griffin sought additional financial aid for his family, while, ironically, lambasting other families' purported dishonesty:

On Sat, Apr 22, 2017 at 7:03 PM, Griffin, Daniel (POL) <daniel.griffin@state.ma.us> wrote:

Good evening CJ,

        I/We received the letter today regarding ▉▉ financial aid. Who ever said "no good deed goes unpunished". Had I known this maybe I shouldn't have returned the 38K that was mistakenly awarded to ▉▉ back in 2014 (just kidding). In all seriousness, thank you for your efforts. I will never understand these aid formulas. If you act financially responsible and pay your debts it seems you get penalized. Live above your means, hide monies and get over your head in debt and you are rewarded. I know of folks first hand with "disabilities" that are on the books at BH for financial aid yet they make significant cash "under the table" thus abusing the system. I could go on but it isn't worth it.

        We will make the appropriate notifications to the business office and deal with ▉▉ when the time is right. Thank you again for your efforts.

Best regards,

Dan & Donna Griffin

Lieutenant  Daniel J. Griffin 1129
Traffic Programs Section
Massachusetts State Police
General Headquarters
470 Worcester Road
Framingham, Ma. 01701

Griffin would know, since he, himself, was the person making "significant cash 'under the table' thus abusing the system."   Indeed, Griffin's lies to the Belmont Hill School remained unabated even **after** his indictment on December 10, 2020.  In the following email to Belmont Hill School officials, Griffin – attempting to reenroll his son at the school – claimed that his whole "tax/financial aid mess" was the result of his "relying on information from a third party which was obviously incorrect."



---------- Forwarded message ----------
From: Daniel Griffin <█████████████████████████>
Date: Mon, Dec 14, 2020 at 2:18 PM
Subject: Fwd: ███s application to Belmont Hill
To: ██@belmonthill.org<████████████████████>>

Good afternoon Steve,

    Thank you for the email. This whole tax/financial aid mess is in the process of being ironed out. I understand your concern and there was never any attempt to misrepresent figures on the aid application. I was relying on information from a third party which was obviously incorrect.  Currently I have a CPA amending and refiling business and personal taxes dating back to 2011. I/We have no issue whatsoever providing whatever info Mr. Dowden would need going forward should ██ be accepted back.
    Merry Christmas to you and your family. Thank you.

Respectfully,
Dan Griffin

In other words, more lies.  Now in the PSR, Griffin contests the Belmont Hill School loss figures by cherry picking testimony and framing the Belmont Hill loss issue as: "What would the Belmont Hill School have awarded Griffin's family had Griffin been honest?"  But instead of asking Griffin's hypothetical question, one that involves an alternate universe where Griffin actually tells the truth, the proper question – which is based in fact – is the following: "What financial aid would the Belmont Hill School have awarded Griffin if they knew Griffin was intentionally lying to them, year after year, about his finances?"

The answer, is zero, as demonstrated by Griffin's withdrawal of his son's application after the Belmont Hill School's Director of Admissions had warned Griffin in a December 14, 2020 email that "We presently have concerns regarding previously submitted financial aid application materials.  If you were to apply for financial aid, we anticipate a close review of financial records and requests for supplemental information."  And to that end, Belmont Hill Director of Financial Aid, Aylin Flanagan's sworn testimony corroborates the evidence for loss in this case:

```
5          Q     Now without any of these disclosures, is it fair
6     to say that you were not provided and the office was not
7     provided prior to your becoming the director with complete
8     information by the Griffins.
9          A     That does appear to be the case.
10         Q     That without this complete information, the office
11    is not able to obtain a truthful and accurate picture of the
12    Griffin family finances.
13         A     We do rely on families to be honest in order for
14    our financial aid system to work properly.
15         Q     And in making the financial aid decision, you and
16    your Financial Aid office at Belmont Hill School rely on the
17    parents to provide complete, accurate and truthful
18    information, correct?
19         A     We do rely on them for that, yes.
```

## II.     Guidelines Adjustments and Enhancements

The government has no objections to the PSR and believes that the U.S. Probation Office has accurately calculated the defendant's advisory guidelines sentencing range of 57 – 71 months' imprisonment, based on the determinative calculations related to Griffin's fraudulent conduct. *See* PSR ¶¶ 32-54.

The government now addresses, Griffin's objections contained in the PSR as to loss amount; sophisticated means; acceptance of responsibility; grouping; and role in offense.

### A.  Griffin's Total Loss (and Gross Gain, if applicable) Exceeded $250,000.

The court must find the facts necessary to impose the enhancements set forth herein only by a preponderance of the evidence. *United States v. Dyer*, 589 F.3d 520, 524 (1st Cir. 2009)

("[T]he government must prove facts essential to sentencing enhancements by a preponderance of the evidence.")

Moreover, with regard to calculating loss, the First Circuit has stated that the following principles apply:

> In calculating loss amounts under the Guidelines, a district court evaluates losses stemming from the conduct of conviction and any relevant conduct. *United States v. Flores-Seda*, 423 F.3d 17, 20-21 (1st Cir. 2005). "**Determination of actual loss need not be precise; '[t]he court need only make a reasonable estimate of the range of loss, given the available information.**'" *United States v. Brandon*, 17 F.3d 409, 457 (1st Cir.1994) (quoting USSG § 2F1.1 cmt. n. 8 (1994)) (alteration in original). A court may base a loss estimate on factors including "[t]he approximate number of victims multiplied by the average loss to each victim" and on "[m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations." USSG § 2B1.1, cmt. n. 3(C)(iii) and (iv) (2005). "[T]he district court 'may rely on the [Presentence Report], affidavits, documentary exhibits, and submissions of counsel.'" *United States v. Ranney*, 298 F.3d 74, 81 (1st Cir.2002).
>
> *United States v. Curran*, 525 F.3d 74, 78 (1st Cir. 2008) (emphasis added).

As noted above, the Court has been provided with more than sufficient evidence that Griffin caused MSP overtime loss in the amount of approximately $142,774.77. *See* PSR ¶ 12. Griffin's disagreement with the PSR's inclusion of Lt. Kiely's loss as irrelevant or overreaching is contrary to the facts and the law. At trial, summary charts that showed multiple examples of Kiely's TPS overtime fraud (Tr. Exhs. 210-218) were uncontested at trial. These exhibits were confirmed and corroborated by Lt. Kiely, himself, who testified that he overlapped overtime shifts with his regular tour, he left shifts early, and he submitted bogus citations, *see supra*. As further support for Kiely loss, the government submits Exhibit B, which constitutes Kiely's loss calculation using the same data and methodology used for the other TPS members.

With respect to the law, the Court is to consider all relevant conduct under U.S.S.G. § 1B1.3(a), which includes, "in the case of a jointly undertaken criminal activity … all acts and

omissions of others that were … within the scope of the jointly undertaken criminal activity, [] in furtherance of that criminal activity, and [] reasonably foreseeable in connection with that criminal activity." *See id.* Kiely, whom Griffin personally directed via email to arrive late at BAT OT sobriety shifts and fraudulently put in false PayStation times (Tr. Exhs. 63, 66), falls squarely within the Guidelines directives requiring attribution of Kiely's loss to Griffin.

With respect to Griffin's Belmont Hill School fraud, the defendant has argued that the $170,000 loss was not ascertainable because Belmont Hill witnesses could not immediately quantify in dollars what amount of aid, if any, that Griffin would have received were he to have submitted an honest, non-fraudulent financial aid application. But as the government points out, this self-serving hypothetical asks the wrong question and ignores the facts of this case. The fact of the matter is that Griffin represented his financial aid applications as truthful, honest, and complete disclosures to the Belmont Hill School – a necessary prerequisite to be considered for aid ("We do rely on families to be honest in order for our financial aid system to work properly." A. Flanagan, Testimony, 10/1/2020). And it was the Belmont Hill School's reliance upon those false representations that caused it to grant financial aid to Griffin. *See* Belmont Hill Director of Admissions email, 12/14/2020).

The First Circuit's *Curran* decision is illustrative of this principle. In *Curran*, the defendant, a "naturopathic" medicine practitioner, falsely held himself out to be a medical doctor in order to attract hundreds of patients for whom he prescribed blood tests and other fraudulent alternative therapies, billing such patients approximately $1.4 million. 525 F.3d. at 77-79. Contesting the $1.4 million loss calculation, the defendant in *Curran* claimed, among other things, that there could be no loss as to at least 56 patients who were happy to receive the defendant's legitimate alternative remedies. *Id.* at 79-80. The Circuit Court quickly rejected this contention,

finding that because the defendant "falsely held himself out to his clients to be a medical doctor, and that the clients … received medically frivolous remedies …. That a few clients relayed their satisfaction with this fraudulent treatment through defense counsel is immaterial in light of the clear evidence of professional impropriety and fraud[.]" *Id* at 80.

Like the defendant in *Curran*, Griffin complains in similar fashion to the Court: "So what I lied to Belmont Hill. My true financial income and assets weren't far from my dishonest figures, so Belmont Hill would have given me some money anyway." This argument, however, ignores the materiality with which Belmont Hill applied to <u>truthful</u> information. Griffin falsely held out his applications to Belmont Hill as <u>truthful financial aid applications</u>, while they were rife with lies and omissions about his income, savings accounts, and vacation home, which were all done with the intent of fraudulently obtaining financial aid from the school. *See Curran*, 525 F.3d at 81 ("We see no definitional problem [of actual loss.] Given the proof of Curran's misrepresentation as to his medical qualifications and of his fraudulent practices, including … questionable tests and treatments he provided, the court could properly find that the payments made by clients fell well within the Guidelines' definition of actual loss, to wit, reasonably foreseeable pecuniary harm that resulted from the offense.")

**B.  Griffin Used Sophisticated Means to Conduct the MSP Overtime Fraud.**

As detailed in the PSR, defendant Griffin used sophisticated means to accomplish the overtime fraud. Griffin selected enforcement locations, on occasion, that were convenient to him and his Cape home; Griffin designated TPS members who lived closest to the overtime assignment to attend roll call so as to help create the impression that the other TPS members had also reported for duty on time; and Griffin personally approved and coordinated the assignments (e.g., telling

Kiely to put in the same false overtime hours as the other members) so as to help conceal the scheme.  PSR ¶ 19.

The First Circuit and its sister circuits have stated that the illustrative list provided by the Guidelines is by no means exhaustive and that "'the [sophisticated means] enhancement properly applies to conduct less sophisticated' than the examples." *United States v. Foley*, 783 F.3d 7, 25 (1st Cir. 2015) (citing approvingly to *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013)).  In *Jennings*, the court rejected the defendant's narrow construction of sophisticated means, in part, "because the enhancement 'does not require a brilliant scheme, just one that displays a greater level of planning or concealment than [the usual type of crime at issue.]'" *Id.*

Moreover, the First Circuit has held that this enhancement is appropriate in cases involving numerous, even repetitive, steps regardless of whether each step was sophisticated. *See, e.g.*, *Foley*, 783 F.3d at 25; *see also United States v. Duell*, 463 F. App'x 214, 215 (4th Cir. 2012) (finding enhancement applied when defendant used a legitimate account for illegitimate purposes by creating false financial statements and forging signatures).  In *Duell*, the defendant, a financial secretary for a local church, transferred money between the church's accounts for three years and ultimately deposited it into his business account. 463 F. App'x at 215.  He then concealed the fraud simply by deleting the transactions from the report that he prepared for the oversight committee. *Id.*  The Fourth Circuit found this to qualify as sophisticated means because "[the defendant] took deliberate steps to make his offense difficult to detect over a period of years."  *Id.*

In the instant case, Griffin's scheme qualifies for the sophisticated means enhancement under an even more stringent standard because, as detailed in the PSR at ¶¶ 8-20 and shown at trial, Griffin took multiple steps, used multiple methods (overlapping shifts, leaving shifts early,

etc.), and controlled and/or influenced numerous individuals over the course of several years to conceal and sustain this corrupt scheme.

### C. Griffin Deserves No Adjustment for Acceptance of Responsibility.

Griffin's request for a reduction for acceptance of responsibility because he pleaded guilty to Belmont Hill School counts and the tax counts is not remotely credible. On Friday, November 17, 2023, ten days prior to the trial date, Griffin's attorney contacted the government and offered to have Griffin plead guilty to the tax counts in exchange for dismissal of the remaining counts. The government rejected this plea offer because, among other reasons, Griffin's prior counsel had offered the same unserious plea over two years earlier. During the same call, Griffin's counsel inquired whether the government would consider dismissal of the TPS counts if Griffin would plead guilty to the tax counts and the Belmont Hill School counts. The government quickly rejected this offer as well. With his bluff having failed, Griffin folded his Belmont Hill and tax cards within days before the trial. This is not acceptance. This is trial strategy.

> U.S.S.G. § 3E1.1 provides for a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). But a defendant who enters a guilty plea is not automatically entitled to this adjustment. *United States v. Franky–Ortiz, 2*30 F.3d 405, 408 (1st Cir. 2000). Rather, the defendant must demonstrate "'candor and authentic remorse' as opposed to mouthing a 'pat recital of the vocabulary of contrition.'" *United States v. McLaughlin,* 378 F.3d 35, 39–40 (1st Cir.2004) (quoting *Royer,* 895 F.2d at 30). He has "the burden of proving his entitlement to an acceptance-of-responsibility credit." *Franky–Ortiz,* 230 F.3d at 408 (quoting *United States v. Ocasio–Rivera,* 991 F.2d 1, 4 (1st Cir.1993)).

*United States v. D'Angelo*, 802 F.3d 205, 210 (1st Cir. 2015) (internal footnote omitted). Griffin does not come close to meeting his burden. Griffin's plea was not timely as reflected by the fact that the government's preparation of exhibits and witnesses for the Belmont Hill and tax counts were ongoing the week prior to trial. In fact, the prepared written stipulations between the

parties, which were introduced in court, still had stipulations pertaining to the Belmont Hill and tax portions of the case. The only intended beneficiary of the eleventh-hour plea was Griffin. By doing so, Griffin could maintain his plea-bargaining power up to the eve of trial, while giving him the option to plead right before trial to preclude the jury from hearing about Griffin's other, numerous and shameful crimes. Even now, Griffin talks out of one side of his mouth about how he should not be held responsible for defrauding Belmont Hill out of the full amount of financial aid that he reaped from his fraud, and out of the other side of his mouth about how he should receive acceptance of responsibility. Given this defendant's aversion to the truth, it should be rejected.

**D.   Grouping the TPS Counts and the Belmont Hill School Counts.**

To compute Griffin's Total Offense Level of 25, Probation grouped Counts 1-10 and 11-21 together because "the offense level in each count group is determined largely on the basis of the total amount or harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." PSR ¶ 33. The government submits that, in so doing, Probation has correctly divided Griffin's 21 counts of conviction into two groups: one for the ten counts of conspiracy, federal programs fraud, and wire fraud (Counts 1-10), all of which resolve for calculation purposes to USSG § 2B1.1; and one for the eleven tax counts (Counts 11-21).

Under the Guidelines, counts that involve the same harm or where the offense level is computed based on the total amount of loss are grouped together. USSG § 3D1.2(d). Exceptions include cases in which a statute specifies a term of imprisonment to be imposed (*e.g.*, where there is a mandatory minimum) or requires that a term of imprisonment be required to run consecutively to other terms of imprisonment. USSG § 3D1.1(b). Neither exception applies here. USSG §

3D1.1(b). Indeed, the Guidelines explicitly list a set of specific offenses that must be grouped together based on the USSG section by which they are covered – including, significantly, USSG § 2B1.1. In fact, the Guidelines contemplate precisely the situation in which a defendant is convicted of multiple types of fraud, all involving monetary loss, and mandates that the buckets of fraud be grouped together when calculating the GSR. In the application notes to Section 3D1.1, the Guidelines state clearly that where a "defendant is convicted of five counts of mail fraud and ten counts of wire fraud" – from "various" schemes – "[a]ll fifteen counts are to be grouped together." USSG § 3D1.2 App. Note 6. In other words, where offenses like federal programs fraud and wire fraud are both routed to USSG § 2B1.1, they are to be grouped together for Guidelines-calculation purposes.

### E. Griffin was an organizer and/or leader of criminal activity that involved five or more participants or was otherwise extensive.

As detailed in the PSR ¶¶ 8-20 and shown at trial, Griffin organized and led his criminal scheme through more than five individuals over the course of several years (e.g., Robertson, Kelley, Weldon, Jakobowski, Kiely, etc.). *See United States v. Preakos,* 907 F.2d 7, 10 (1st Cir. 1990) ("… the only logical interpretation of the Guideline[§ 3B1.1(a)] is to count the defendant as one of the participants"). In the First Circuit, participants that are "criminally responsible" do not have to actually have committed the substantive offense, rather than simply participate in "the criminal activities that culminated in the [offenses charged]…." *See United States v. Catano*, 65 F.3d 219, 230 (1st Cir.) supplemented, 66 F.3d 306 (1st Cir. 1995); *United States v. Cassiere*, 4 F.3d 1006, 1012-13 (1st Cir. 1993) (rejecting claim that subjects were not participants because they were not involved with substantive offense). In *Cassiere*, the First Circuit, dealing with a scheme involving land flip transactions, found a real estate agent criminally responsible because

17

while she was not a direct participant, lenders relied heavily on the accuracy of her appraisals; therefore her role was vital. 4 F.3d at 1013, 1015 (The court further rejected the real estate agent's argument that "the jury was left to speculate as to what conduct on the part of [the real estate agent] was inappropriate.")

Griffin's scheme was also extensive when accounting for all of those individuals that Griffin involved in the course of the continuing offense. In *United States v. Colon-Munoz*, 192 F.3d 210, 364-65 (1st Cir. 1999), the First Circuit upheld the aggravating role enhancement due to the extensive nature of the bank fraud at issue. *Id.* The defendant used his position as CEO of a bank to provide bank loans to his mortgagees in lieu of personal payments. *Id.* at 352-54. The court in upholding the enhancement, noted that the courts have to take into account all persons involved in the scheme, even if they were innocently performing their jobs. *See id.* at 364 (finding it proper in bank fraud to take into account the people who handled the external paperwork for various deeds, the innocent internal documentation of the fraud, and the notary public and witnesses who signed off on the documents). Similarly, Griffin used the members of TPS throughout the conspiracy to further his ends. Whether it was Kelley, Robertson, Jakobowski, and Kiely that Griffin ordered to enter false PayStation entries, or Kelley that Griffin asked to process and handle TPS overtime paperwork, or Kiely that Griffin directed to show up to overtime shifts late, but enter false hours worked, Griffin manipulated all of these individuals and masterminded all of this extensive activity in furtherance of his crimes, and therefore, clearly merits the organizer/leader role enhancement.

### III.   The 3553(a) Factors

### A.  The Nature and Circumstances of the Offense Warrant a 71 Month Sentence.

"Power tends to corrupt, and absolute power corrupts absolutely."  John Emerich Edward Dalberg-Acton, Historical Essays and Studies (1907).  With the power of his badge, with the power of his State Police rank and stature, and with his power over the purse strings of hundreds of thousands of dollars in federal grants, Daniel Joseph Griffin wielded his official authority to steal thousands and thousands of dollars in taxpayer-funded overtime with impunity.  For years.  Those he tapped to join the anointed overtime class that comprised the Traffic Programs Section paid their fealty to Griffin by going along with the program – leave work early, leave overtime shifts early, submit false paperwork, collect additional thousands of dollars in tainted overtime pay, repeat.

Griffin's crimes were even worse when considering that the purpose of the hundreds of thousands of dollars in federal highway grants was to improve safety and save lives on our public roadways.  From the vantage of the National Highway Traffic Safety Administration, the logic was simple – more federal grant money meant more officers on the road, and more hours of traffic safety enforcement.  Indeed, to put it into stark perspective, imagine what $142,774 could pay for in additional MSP patrols on the road.  Would our roads have been safer, or could a motorist's injury have been prevented with those funds dedicated to additional traffic enforcement?  The answer is clear.  But equally clear was the fact that, when it came to overtime, Griffin put himself first.

Indeed, Griffin's greed knew no bounds.  It wasn't enough to steal tens of thousands of dollars in overtime.  Griffin stole thousands of dollars in financial aid from the Belmont Hill School while crying poverty and flashing his MSP credentials via email.  Griffin, with his fat MSP salary, inflated with overtime fraud, and his hundreds of thousands of dollars in tax-free KnightPro income, shamelessly squeezed Belmont Hill for additional financial aid, all while pointing his

finger and accusing other people of "hiding money." Could an honest Belmont Hill applicant, actually in need of financial aid have been helped by an additional $177,600 in financial aid? Again, when it came to financial aid, Griffin put himself first.

And Griffin again put himself first when it came to paying, or not paying, taxes. Instead of paying his fair share of federal income taxes, Griffin lied to the IRS and his Tax Preparer by methodically shaving income off his general ledger, allowing him to cheat the IRS out of tens of thousands of dollars in taxes every year.

As a public official committing crimes against the public trust, Griffin's offenses carry a particularly corrosive effect in our society. By abusing his badge and his public position, Griffin committed crimes that erode the citizenry's trust in its public officials. His Belmont Hill School fraud likely did the same between prospective financial aid applicants and school officials. And Griffin's nearly decade-long tax fraud broadly undermines our faith in the federal tax system's ability to ensure that every citizen pays their fair share of the nation's tax burden. These were serious crimes that were committed – not in isolation, but rather – year after year after year. Given the seriousness, breadth and magnitude of Griffin's offenses, his crimes warrant a 71-month sentence.

**B. Griffin's History and Characteristics Weigh in Favor of a 71 Month Sentence.**

During the course of the investigation and trial, the government learned that all State Police officers were bound by an internal code of conduct requiring truthfulness from its sworn members. Tr. Exh. 5. What the government also learned was that, despite this code, Griffin made lying a part of his everyday life.

As a State Police officer, Griffin lied on his Form 636, he lied on his PayStation, and he lied in his TPS hours submissions to EOPSS. He lied on these forms countless times as part of his

TPS overtime fraud, and he told others to lie on the same forms. But Griffin's lying wasn't limited to overtime. Griffin lied when it came to his regular tour of duty as well. Time after time, Griffin would claim on PayStation to be working his normal shift, but in reality, Griffin would be attending to his personal or personal business matters, e.g., Griffin attended opening day at Fenway during regular work hours (3/13/2015);   Griffin met his KnightPro client (Brandeis Head of Security) during work hours (5/4/2017); and Griffin would be harassing his rental tenants during work hours (9/23/2016).

Even more troubling, at least one State Police surgeon did not believe Griffin's claim that one of his knee injuries was a work-related injury. In a May 2000 complaint against Griffin, the State Police surgeon reported that Griffin, who was unhappy that the surgeon had rendered a medical opinion that Griffin's knee injury was not work-related, berated the surgeon about his opinion and proceeded to call the surgeon "garbage" numerous times. Despite Griffin's verbal attack, the surgeon stood by his opinion on Griffin's knee. *See* Exhibit C.

When Griffin was out "injured line-of-duty" in 2018 (still receiving regular pay), his own actions raised questions about the legitimacy of his work-related knee injury. This is because, despite Griffin claiming a knee injury to such an extent that he needed to be sidelined (with pay) for an entire year, Griffin was well enough in June 2018 to take a trans-Atlantic flight to the Netherlands, where he would take an "odyssey of a walk," which were all done as part of Griffin conducting KnightPro business while out on injured leave.

| | |
|---|---|
| **From:** | Dan Griffin |
| **To:** | ▮ |
| **Subject:** | Re: Red Sox |
| **Date:** | Wednesday, June 6, 2018 1:56:09 PM |

Hi ▮

Working off of WiFi hotspots.  Touched base w ▮ but after I had eaten while on my odyssey of a walk. Hopefully tomorrow we can do lunch or dinner. It depends on her schedule. I plan on biking tomorrow if possible to Explore this beautiful city.

No worries on the Sox. Hopefully you can make a game. Seats are even closer to the field behind home plate. Taking my Youngest to Baltimore next week for two games. Hope All is well. Perhaps I will see you Friday.

All the best
Dan

On Jun 6, 2018, at 6:56 PM, ▮ @harvard.edu> wrote:

> Dan,
>
> I'm not sure you are checking email but I hear you may be going to dinner tonight with ▮. I wanted to let you know that her son is a HUGE Sox fan and since I am unable to go to the game on the 26[th], (courier trip) I gave the tickets to her so she could take her son.  I hope you don't mind.  If I am ever unable to go, I always try to find someone that A) you know and B) really appreciates them.  They went last year, I forget why I couldn't go to that particular game, and they sent me several texts, pictures and videos from the game they were so excited.
>
> Hope you are enjoying Amsterdam.  I hear the hotel is not so nice…..
>
> ▮
>
> ▮
>
> Director of Collections Management
> 617-496-0986
> ▮
>
> Harvard Art Museums
> 32 Quincy Street, Cambridge, MA 02138
> www.harvardartmuseums.org

In addition, as detailed earlier, Griffin lied on a yearly basis to his Tax Preparer claiming that KnightPro either made no money or lost money.[4]  Griffin created false QuickBooks records that hid his tax scheme, while racking up personal charges on his corporate KnightPro credit card.

And finally, Griffin would lie every year to the Belmont Hill School.  Whether it was submitting his false tax returns to the school or simply omitting income and other assets, Griffin lied up and down the financial aid forms to school officials on a regular basis.  Given Griffin's greed, his unrepentant lying, and his abuse of his public position and the public trust, consideration of this defendant's history and characteristics weighs in favor of a 71-month sentence.

### C.  A Sentence of 71 months Reflects the Seriousness of the Offenses, Promotes Respect for the Law, Provides Adequate Punishment, and Serves General and Specific Deterrence.

Griffin seeks a departure or variance from this Court, arguing that he is similarly situated to other defendants, including those MSP Troopers that were federally charged as part of the Troop E investigation.  Griffin is not.  For starters, unlike Griffin, every Troop E defendant that was charged federally pled guilty to his overtime fraud and **accepted responsibility** for overtime fraud.  *See* Exhibit D.  Unlike Griffin, none of the Troop E defendants were found to have participated in and led a three-year conspiracy involving five or more other officers.  Unlike Griffin, none of the Troop E defendants participated in a conspiracy where a co-conspirator destroyed records to obstruct justice.  Unlike Griffin, none of the Troop E defendants were found to have jointly stolen over $100,000 in overtime in a three-year period.  Unlike Griffin, none of the Troop E defendants were found to have run a million-dollar side business and evaded paying taxes on over $700,000.  Unlike Griffin, none of the Troop E defendants were found to have simultaneously defrauded a

---

[4] It is not lost on the government that Griffin claims in the PSR that KnightPro "is not currently earning a profit."  Based on the KnightPro records reviewed by the government, that would be a first.

private school out of over $170,000.  With the exception of David Wilson, unlike Griffin, none of the Troop E defendants were higher than the rank of Trooper.  And unlike Griffin, a majority of the Troop E defendants cooperated with the government.  Griffin is not similarly situated to the Troop E defendants, and therefore, no departure or variance is warranted on that basis.

A significant prison sentence is also necessary to promote respect for the law, provide adequate punishment, and serve the goals of deterrence.  If Troop E provides us with sentencing guidance, it informs us that none of the Troop E sentences adequately promoted respect for the law or sufficiently served those other goals.  With the exception of Daren DeJong, all of the Troop E defendants were sentenced by June 2019.  In August 2019, the State Police launched its own internal affairs investigation of Griffin related to overtime.  By November 2019, the State Police internal affairs investigation of Griffin completely exonerated him of any wrongdoing.

Despite multiple Troopers being arrested, pleading guilty and being sentenced for overtime fraud from 2018 to 2019, the State Police absolved Griffin, its most prolific offender to date, in a matter of four months.  Even in the aftermath of Griffin's and Robertson's indictment in 2020, four current and former Troopers have been charged with falsifying CDL records and giving preferential treatment to certain CDL applicants,[5] while 7 of the top 10 paid state employees (outside the U. Mass system) are all with the State Police, many of them earning over $200,000 a year in overtime pay, alone.[6]

Griffin is not the first Trooper charged with overtime fraud and may not be the last, but for now, he is the poster boy of State Police corruption.  It is well-earned.  Because of the breadth and

---

[5] https://www.wbur.org/news/2024/02/08/state-trooper-not-guilty-plea-cdl-bribery
[6] https://www.bostonglobe.com/2024/01/09/metro/massachusetts-state-payroll-highest-earners-in-2023/

duration of his stealing overtime, because he leveraged his official position to cause others to steal overtime, and because his criminal inclinations knew no bounds as he committed other serious crimes contemporaneously, Griffin is deserving of the most serious sentence recommended by the Guidelines.

The government thus believes that a sentence of 71 months' incarceration, $506,763.77 in restitution, and forfeiture in the amount set forth in the government's motion for order of forfeiture (ECF Dkt. No. 200) is thus sufficient but not greater than necessary to acknowledge the seriousness of the offense, justly punish the defendant, protect the public, and promote respect for the law.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: */s/ Dustin Chao*
    DUSTIN CHAO
    ADAM W. DEITCH
    Assistant U.S. Attorneys

**Certificate of Service**

I certify that, on March 14, 2024, this document was sent electronically to the registered participants via email.

*/s/ Dustin Chao*
Dustin Chao